******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

JAMES M. PROCACCINI, ADMINISTRATOR
(ESTATE OF JILL A. PROCACCINI)
*v.* LAWRENCE AND MEMORIAL
HOSPITAL, INC., ET AL.
(AC 38380)

Prescott, Mullins and Beach, Js.

*Syllabus*

The plaintiff administrator of the estate of the decedent sought to recover
damages from the defendant E Co. for medical malpractice in connection
with the death of the decedent by a methadone overdose. On November,
29, 2008, the decedent was found unresponsive and was brought to a
hospital emergency department, where she was treated for a suspected
drug overdose by M, the attending emergency department physician.
After the decedent's vital signs improved and stabilized, she was dis-
charged and returned to the home of a friend, where she was found
unresponsive the next morning and pronounced deceased. The plaintiff
alleged that E Co. was vicariously liable for the medical malpractice of
M in treating the decedent for a suspected drug overdose. The plaintiff
claimed that M's discharge of the decedent after only four and one-half
hours of observation was premature in that M should have kept the
decedent under medical monitoring for twenty-four hours, which is the
period of time during which the fatal side effects of methadone toxicity
may occur, and that if the decedent had remained under medical monitor-
ing for the full twenty-four hours, the fatal overdose side effects she
experienced after her discharge would have been treated and her even-
tual death from methadone toxicity would have been averted. The jury
returned a verdict for the plaintiff, and the trial court rendered judgment
in accordance with the verdict, from which E Co. appealed to this court.
E Co. claimed, inter alia, that there was no direct evidence as to when the
decedent consumed the fatal dose of methadone, and that the undisputed
scientific evidence established that if she had actually overdosed on
methadone on November 29, 2008, she would have had a recurrence
of overdose symptoms before she was discharged from the hospital's
emergency department. *Held*:

1. There was sufficient evidence to support the jury's finding that E Co.'s
negligence caused the decedent's death:

a. The jury had before it sufficient evidence from which it could have
inferred, without resorting to speculation, that the decedent had con-
sumed the fatal dose of methadone before she was brought to the
emergency department on November 29, 2008: although the jury was
presented with conflicting expert testimony as to how soon a methadone
overdose patient would experience recurring overdose symptoms after
receiving a certain medication that is used as an antidote for opiate and
opioid overdoses, the jury was free to believe the opinion of the plaintiff's
expert witness, S, on the standard of care, that delayed, recurring respira-
tory depression can occur in methadone overdoses, even if such a
phenomenon defied certain undisputed and settled toxicology princi-
ples, and to disbelieve those portions of the testimony of E Co.'s expert
witness, P, on causation, that attempted to refute that phenomenon,
and E Co.'s claim that it was improper for the jury to consider S's
testimony concerning the concept of delayed, recurring respiratory
depression as it related to causation was unavailing because even if S's
testimony was offered strictly for standard of care purposes, E Co.
failed to pursue any preemptive or remedial measures that would have
precluded or limited S's testimony on the issue of delayed, recurring
respiratory depression, and the court never instructed the jury that it
should disregard S's testimony thereon or that it should consider such
testimony only for standard of care purposes, and, therefore, the evi-
dence regarding delayed, recurring respiratory depression was before
the jury to use for any purpose, including causation; moreover, the fact
that the decedent did not immediately experience recurring overdose
symptoms one hour after the overdose medication was administered
did not require the jury to conclude that the decedent's overdose on

November 29, 2008, was caused by a narcotic other than methadone, as the jury could have concluded, instead, that the delayed, recurring respiratory depression that the decedent eventually experienced was consistent with her ingestion of a toxic dose of methadone before her visit to the emergency department on November 29, 2008.

b. E Co. could not prevail on its claim that because the plaintiff failed to present evidence demonstrating that the decedent would have been admitted to the hospital had M not discharged her from the emergency department, the jury could not reasonably have found that E Co. caused the decedent's death: although the plaintiff's expert, S, initially testified that the standard of care applicable to possible methadone overdoses required M to admit the decedent to the hospital for continuous monitoring, S subsequently clarified that the applicable standard of care required only that M monitor the decedent for twenty-four hours for signs of recurrent opiate overdose, and the jury reasonably could have accepted that portion of S's testimony indicating that monitoring was required and rejected that portion of his testimony suggesting that admittance was required; accordingly, to prove causation, the plaintiff needed to show only that the decedent could have been monitored sufficiently for twenty-four hours, and the jury reasonably could have inferred that from the evidence presented.

2. The trial court did not abuse its discretion in denying E Co.'s motion to set aside the jury's award of $150,000 in damages for the destruction of the decedent's capacity to carry on and enjoy life's activities; the jury reasonably could have forecast the decedent's life expectancy from its own knowledge and from the substantial evidence presented by the plaintiff of the decedent's age, health, physical condition and habits, all of which were relevant to determine life expectancy, and, therefore, the jury's award of damages for the destruction of the decedent's capacity to carry on and enjoy life's activities was not unreasonable or speculative.

Argued March 21—officially released August 22, 2017

*Procedural History*

Action to recover damages for medical malpractice, and for other relief, brought to the Superior Court in the judicial district of New London, where the action was withdrawn as against the named defendant et al.; thereafter, the plaintiff filed an amended complaint as against the defendant Emergency Medicine Physicians of New London County, LLC; subsequently, the matter was tried to the jury before *Hon. Joseph Q. Koletsky*, judge trial referee; verdict for the plaintiff; thereafter, the court denied the motions to set aside the verdict and for a directed verdict filed by the defendant Emergency Medicine Physicians of New London County, LLC, and rendered judgment in accordance with the verdict, from which the defendant Emergency Medicine Physicians of New London County, LLC, appealed to this court. *Affirmed.*

*Daniel J. Krisch*, with whom were *Frederick J. Trotta, Sr.*, and, on the brief, *Logan A. Forsey* and *Jennifer S. Mullen*, for the appellant (defendant Emergency Medicine Physicians of New London County, LLC).

*Matthew E. Auger*, with whom, on the brief, was *Eric W. Callahan*, for the appellee (plaintiff).

*Opinion*

MULLINS, J. In this medical malpractice action, the defendant[1] Emergency Medicine Physicians of New London County, LLC, appeals from the judgment of the trial court, after a jury trial, rendered in favor of the plaintiff, James M. Procaccini, administrator of the estate of Jill A. Procaccini (decedent). On appeal, the defendant claims that there was insufficient evidence supporting the jury's verdict and award of noneconomic damages. Specifically, it claims that the plaintiff failed to present sufficient evidence for the jury (1) to find that the defendant's negligence caused the death of the decedent, and (2) to award $150,000 in damages for the destruction of the decedent's capacity to carry on and enjoy life's activities. We affirm the judgment of the trial court.

The following facts, as reasonably could have been found by the jury, and procedural history are relevant to this appeal. On November 30, 2008, the decedent, who was thirty-two years old, died from a methadone overdose. In the years leading up to her death, the decedent had struggled with polysubstance abuse.

After achieving a period of sobriety early in 2008, the decedent relapsed on November 16, 2008. On that date, the decedent admitted herself to Saint Francis Hospital and Medical Center in Hartford (Saint Francis), seeking treatment for a heroin overdose. On the next day, November 17, 2008, the decedent was transferred to Cedarcrest Hospital, Blue Hills Substance Abuse Services (Blue Hills), in Newington.

The decedent remained at Blue Hills from November 17, 2008, until her discharge on November 28, 2008. During her stay at Blue Hills, the decedent was administered varying doses of methadone for treatment of her opiate withdrawal symptoms. Methadone, an opioid,[2] frequently is used by clinicians to alleviate the withdrawal symptoms that patients experience while undergoing opiate detoxification. Although methadone commonly is used in the clinical setting and, thus, administered under a clinician's supervision or pursuant to a prescription, it also can "be purchased [illegally] on the streets as street methadone." The decedent's last dose of methadone, five milligrams, was administered at Blue Hills at 7:45 a.m. on November 21, 2008. The decedent was discharged from Blue Hills on November 28, 2008.

After leaving Blue Hills on November 28, 2008, the decedent made at least two phone calls. One of those calls was to a person from whom the decedent had purchased drugs in the past. Another call was to Charles Hope, a substance abuse counselor and a recovering drug addict with whom the decedent was friendly. Hope agreed to let the decedent stay at his house in New London on the condition that she not use drugs. Hope

picked up the decedent from West Hartford on the evening of November 28, 2008, and brought her to his home in New London. Upon their arrival at Hope's home, Hope and the decedent talked briefly and then retired for the night. Hope heard the decedent use the microwave in his kitchen at some point during the night.

On the morning of November 29, 2008, Hope woke up the decedent and noticed that she was "feeling a little sick." Hope left his home sometime in the late morning or early afternoon of November 29. Hope later called the decedent sometime that afternoon and had a conversation with her. When Hope returned to his home at approximately 6:45 p.m., however, he found the decedent lying unconscious on his living room couch. Hope began performing cardiopulmonary resuscitation, which restored the decedent's breathing. At approximately 6:47 p.m., Hope called 911.

Emergency medical technicians (EMTs) from the New London Fire Department arrived at Hope's house on November 29, 2008, at approximately 6:51 p.m. The EMTs found the decedent unresponsive, lying in a supine position in Hope's living room with pinpoint pupils and agonal respirations. Hope told the EMTs that the decedent "had been on methadone," that the decedent "had a history of addiction," and that he was unsure if she used drugs that day. Because she was unconscious, however, the EMTs were unable to obtain any medical history from the decedent. The EMTs administered oxygen to the decedent via an oral airway and bag valve mask. Hope and the EMTs briefly searched Hope's house for drugs, drug paraphernalia, and other evidence of drug use. They did not find any such evidence.

Shortly thereafter, at approximately 6:55 p.m., paramedics from Lawrence & Memorial Hospital (Lawrence & Memorial) arrived on the scene. The paramedics placed the decedent in their ambulance. At some point between 6:55 p.m. and 7:03 p.m., the paramedics intravenously administered the decedent 1.4 milligrams of Narcan.

Narcan is used as an "antidote" for opiate and opioid overdoses. Narcan, like opiates and opioids, attaches to the opioid receptors located in the body's central nervous system. Narcan, however, does not cause any of the effects that opiates and opioids produce, such as pain relief, a "high" feeling, and respiratory depression. Instead, because opioid receptors have a "stronger affinity for the Narcan molecule than [they do] for [opiates and opioids]," Narcan "just knocks [opiates and opioids] out and takes residency in the receptor[s] . . . ." "[Once] [t]he Narcan displaces the opiate [or opioid] from the receptor[s] . . . the person's opiate effects evaporate . . . the person wakes up and [he or she is] breathing and . . . alert . . . ." In other words, "intravenous administration of Narcan . . . pro-

duce[s] a near-instantaneous reversal of the narcotic effect . . . within a minute or two at the most . . . ."

By the time the ambulance arrived at Lawrence & Memorial at 7:03 p.m., the dose of Narcan had revived the decedent. The decedent was conscious and answering questions asked by the paramedics. The paramedics were able to determine that the decedent was taking several medications, including methadone, Topamax, Seroquel, insulin, and Ambien. In their written report, the paramedics indicated that the "chief complaint" was an "[overdose] on Heroin" and that the decedent was "found in respiratory arrest due to [overdose]."

Upon arriving at Lawrence & Memorial, the decedent was taken to the emergency room, where her condition was triaged. In examining the decedent, the triage nurse, Sarah Zambarano, created an electronic report detailing the decedent's condition at 7:13 p.m. Zambarano indicated in the electronic report that the paramedics informed her that Hope told them that the decedent "took methadone, ? of heroin."

At approximately 7:15 p.m., the decedent was assessed by another emergency room nurse, Pamela Mays. At 7:36 p.m., Mays recorded the following in her treatment notes: "[the decedent] admits to using heroin toni[ght] . . . states off methadone for several months after detox . . . now using again." Mays also indicated that the decedent "appear[ed] comfortable" and was "cooperative," "alert" and "oriented . . . ." Contrary to May's notes, Hope, who had arrived at the emergency room between 7:30 p.m. and 8 p.m., recalled that the decedent was "very adamant that she did not take any heroin . . . ." According to Hope, the decedent told Mays that "I did not take any heroin, I took methadone."

At approximately 7:45 p.m., the attending emergency room physician, Thomas E. Marchiondo, examined the decedent. At the time he began treating the decedent, Marchiondo had access to the paramedics' report, which indicated that the decedent had a suspected overdose on heroin, that the decedent also was taking methadone, and that the decedent had been found in respiratory arrest. Marchiondo detailed his examination of the decedent in his own written report. In his report, Marchiondo noted that the decedent's "chief complaint" was an "unintentional heroin overdose." Although the decedent apparently denied any "other co-ingestion," Marchiondo's report indicated that the decedent's "current medications" included methadone.

Marchiondo's report also indicated that a urine toxicology screen had been ordered. The results of the screen, of which Marchiondo was aware when treating the decedent, revealed that the decedent's urine tested positive for the presence of methadone, an unidentified opiate, and unidentified benzodiazepines. Because that screen merely was qualitative, it could not identify the

specific type of opiate ingested by the decedent or the exact concentration of that substance or methadone in the decedent's system.

As a result of his review of the drug screen results, as well as his examination of the decedent and review of the treatment notes prepared by the nurses and emergency responders, Marchiondo concluded that the decedent had ingested both methadone and heroin. Regarding the methadone, although he could not determine specifically when or in what manner the decedent ingested it, Marchiondo concluded that the decedent ingested some quantity of methadone "within the past couple of weeks." In so concluding, Marchiondo relied on the fact that methadone was listed as a medication in her medical history, which caused him to believe that the decedent was taking the methadone "under a doctor's prescription . . . ." Marchiondo consequently "would have expected [methadone] to come out positive in her urine." Accordingly, he concluded that the overdose symptoms that the decedent was experiencing "were due to a heroin overdose" and agreed with a statement by the plaintiff's counsel that the decedent's symptoms "[were] in no way related to the methadone that was in her system."[3]

The decedent remained in the Lawrence & Memorial emergency room from 7:13 p.m. to approximately 11:53 p.m. on November 29, 2008. "All throughout her stay . . . [the decedent] remained awake, alert, and aware, nontoxic. And through time . . . her vital signs had improved." Hope, who had stayed with the decedent at her bedside, also observed that, although initially the decedent seemed, as characterized by the defendant's counsel, "sluggish," her condition continued to improve and she was "laughing and making jokes." During her hospitalization at Lawrence & Memorial, the decedent was not administered any Narcan. Marchiondo had determined that it was not necessary to treat the decedent with Narcan because her vital signs had improved while she was at Lawrence & Memorial.

Throughout her stay, the decedent was monitored by Mays, who noted in her report that the decedent's vital signs improved and stabilized. At approximately 8 p.m., the decedent was "awake and alert and asking to leave . . . [but was] told that she was here for the night." At this point, the decedent's respiration rate had improved to sixteen breaths per minute, and her oxygen saturation level had risen to 99 percent. These levels were "basically normal." The decedent also had been taken off supplemental oxygen.

At 9 p.m., the decedent was "resting soundly" and her "[respiration was] easy/even." Her respiration rate and oxygen saturation level had not changed since 8 p.m. At 10 p.m. and 11:30 p.m., the decedent's respiration rate still was sixteen breaths per minute, and her oxygen saturation level still was 99 percent. At some

point between 11:35 p.m. and 11:53 p.m., the decedent was discharged and was provided instructions for a "narcotic overdose," which advised the decedent to "[r]eturn to the ER if [her condition] worse[ned]."

Upon being discharged from Lawrence & Memorial, the decedent left with Hope. Hope and the decedent stopped for food and coffee before returning to Hope's home. At Hope's home, Hope and the decedent conversed until approximately 1:30 a.m. on November 30, 2008, at which point, Hope went to bed. When Hope left the decedent to go to bed, the decedent was kneeling on the corner of the bed in Hope's guest bedroom, watching television and looking at photographs. Hope did not hear any activity during the night.

After waking up at approximately 9:45 a.m. later that morning, Hope found the decedent unresponsive. The decedent's body was "frozen stiff" and kneeling in the same position in which she had been on Hope's guest bed when Hope last saw her at 1:30 a.m. earlier that morning. Hope called 911 at approximately 10:39 a.m.

New London police, accompanied by New London Fire Department EMTs, arrived at Hope's home on November 30 at approximately 11 a.m. The decedent was pronounced deceased by the EMTs at approximately 11:05 a.m. Thereafter, Hope assisted the police in searching his entire house for drug paraphernalia and other evidence of drug use. Neither Hope nor the five law enforcement officers searching the scene found anything relating to drug activity.

At approximately 1:34 p.m., Penny Geyer, an investigator with the Office of the Chief Medical Examiner, arrived at Hope's home. At the scene, Geyer performed an external examination of the decedent's clothed body. She did not find any illicit drugs or drug paraphernalia on or around the decedent's body, and she did not observe any signs of drug ingestion on the decedent's body, such as needle marks or residue in the decedent's nose or mouth.

Deputy Chief Medical Examiner Edward T. McDonough III performed the decedent's autopsy on December 1, 2008. A toxicology screen ordered by McDonough detected the presence of methadone in the decedent's blood. Specifically, the report indicated that the concentration of methadone in the decedent's blood was 0.39 milligrams per liter. The postmortem toxicology screen did not detect any opioids or opiates other than methadone.

As a result of his review of the toxicology report and his examination of the decedent, McDonough concluded that the final cause of the decedent's death was "methadone toxicity." In so concluding, McDonough determined that the postmortem concentration of methadone in the decedent's blood, 0.39 milligrams per liter, was "within the fatal range." McDonough also deter-

mined that the decedent died sometime between 5 a.m. and 7 a.m. on November 30, 2008, although this was merely a "crude" approximation because the time of death could have been "much earlier."

In November, 2010, the plaintiff, acting as the administrator of the decedent's estate, brought this medical malpractice action seeking damages for the decedent's death. The plaintiff's initial complaint asserted one count against Marchiondo, one count against Lawrence & Memorial Hospital, Inc., and Lawrence & Memorial Hospital Corporation, and one count against the defendant. Following the plaintiff's withdrawal of the separate counts against Marchiondo and Lawrence & Memorial Hospital, Inc., and Lawrence & Memorial Hospital Corporation; see footnote 1 of this opinion; the plaintiff amended his complaint to seek recovery from only the defendant.

The plaintiff's operative complaint alleges that the defendant is vicariously liable for the medical malpractice that its employee,[4] Marchiondo, committed in treating the decedent for a suspected drug overdose on November 29, 2008. The gravamen of the plaintiff's complaint is that Marchiondo's discharge of the decedent after only four and one-half hours of observation at Lawrence & Memorial was premature. According to the plaintiff, because the decedent presented with a possible methadone overdose, Marchiondo should have kept her under medical monitoring for twenty-four hours, which is the period of time during which the fatal side effects of methadone toxicity may occur. Accordingly, the plaintiff alleges, if the decedent had remained under medical monitoring for the full twenty-four hours, the fatal overdose side effects she experienced after her discharge would have been treated and her eventual death from methadone toxicity would have been averted.

In his complaint, the plaintiff sought both economic and noneconomic damages resulting from the decedent's death. The claim for economic damages included medical expenses and funeral costs, and the claim for noneconomic damages sought compensation for the decedent's permanent loss of her ability to carry on and enjoy life's activities.

After the plaintiff rested, the defendant moved for a directed verdict. Specifically, the defendant argued that "the plaintiff [had] not submitted sufficient evidence to establish a prima facie case *with respect to causation.*" (Emphasis added.) The defendant did not challenge the sufficiency of the evidence regarding the appropriate standard of care and the defendant's breach thereof. The court reserved decision on the defendant's motion for a direct verdict.

The jury returned a plaintiff's verdict and awarded $12,095 in economic damages and $500,000 in noneco-

nomic damages. The award consisted of $350,000 for the decedent's death and $150,000 for the destruction of the decedent's capacity to carry on and enjoy life's activities.

After the jury returned its verdict, the defendant renewed its motion for a directed verdict.[5] As in its initial motion, the defendant challenged the sufficiency of the evidence only with respect to causation: "[T]he evidence presented by the plaintiff during his case-in-chief [was] insufficient to support a conclusion that any alleged negligence on the part of the defendant was the cause in fact of the death of [the decedent]." Specifically, the defendant argued that there were "two missing links in the plaintiff's chain of causation: (1) that [the decedent] overdosed on methadone on [November 29, 2008]; and (2) that [the decedent] met the criteria for admission to [Lawrence & Memorial]."

Regarding the first "missing link," the defendant contended that "the jury had no basis—other than conjecture—to find that [the decedent] overdosed on methadone on November 29, [2008]. To the contrary, science and the chronology of events point only to the 'reasonable hypothesis' that [the decedent] took the lethal dose of methadone *after* Dr. Marchiondo discharged her." (Emphasis in original.)

Regarding the second "missing link," the defendant contended that "the jury could only guess about another critical piece of the puzzle: admission to [Lawrence & Memorial]. . . . [T]here was no evidence about [Lawrence & Memorial's] criteria for admission, or whether [the decedent] met those criteria." According to the defendant, the applicable standard of care required Marchiondo to admit the decedent to Lawrence & Memorial. Thus, the defendant posited, the plaintiff could not prove that Marchiondo's breach of that standard of care caused the decedent's death without evidence that the decedent likely would have been admitted to Lawrence & Memorial.

After holding a hearing on the defendant's renewed motion for a directed verdict, the court denied the motion. This appeal followed. Additional facts will be set forth as necessary.

I

SUFFICIENCY OF EVIDENCE ON CAUSATION

The defendant's first claim on appeal is that the plaintiff failed to present sufficient evidence from which the jury reasonably could have found that the defendant caused the decedent's death. Specifically, the defendant argues that "there are two gaping holes in the evidence: (1) proof that the decedent consumed the fatal dose of methadone *before* her discharge from the emergency room on November 29, [2008], and (2) proof that she met the criteria for admission to [Lawrence & Memorial]." (Emphasis in original.) We consider the defendant's

two causation challenges seriatim.

## A

In its first challenge to the sufficiency of the evidence on causation, the defendant contends that there "was no direct evidence [regarding] *when* the decedent consumed the fatal dose of methadone. . . . [O]nly creative guesswork supports the jury's inference that the decedent did so before, *and not after*, her discharge from the emergency room." (Emphasis added; internal quotation marks omitted.) In particular, the defendant argues that the jury's finding regarding causation is inconsistent with "time and science, i.e., the mechanical details disclosed by the evidence . . . ." (Internal quotation marks omitted.) According to the defendant, the "undisputed" scientific evidence presented at trial demonstrated that "[i]f the decedent had actually overdosed on methadone on November 29, [2008], she would have had a recurrence of overdose symptoms *long before* she was discharged [from Lawrence & Memorial]." (Emphasis added.) Thus, because the decedent did not experience recurring overdose symptoms "long before" her discharge, she had not consumed a toxic amount of methadone on November 29. We disagree.

The following additional facts and procedural history guide our resolution of this claim. A substantial part of the evidence presented by both parties at trial came in the form of expert testimony. Both parties presented expert testimony on the issue of causation. McDonough, who was disclosed as the plaintiff's causation expert, also was the medical examiner who performed the decedent's autopsy. He testified that the postmortem level of methadone in the decedent's blood, 0.39 milligrams per liter, was a toxic concentration and caused her death. He further testified that the specific "mechanism of death" probably was respiratory depression, in which the methadone intoxication would have "[shut] down [the decedent's] breathing." McDonough's determination of the cause of death called into doubt Marchiondo's diagnosis of the decedent, which was that she had overdosed on heroin, not methadone.

Dr. Steven Pike, the defendant's expert on causation, initially testified that he could not determine within a reasonable degree of medical probability whether the decedent's cause of death was methadone toxicity. He later testified, however, that "it's probably more likely than not" that methadone toxicity was the cause of the decedent's death.

The defendant's strategy in contesting causation essentially was to demonstrate that the decedent ingested the fatal dose of methadone *after* she was discharged from Lawrence & Memorial. According to the defendant, if the plaintiff could not establish that the decedent ingested the fatal dose *before* her discharge, there would be no causal connection between

the allegedly negligent treatment she received at Lawrence & Memorial and the methadone toxicity to which she eventually succumbed. Critically, during the defendant's cross-examination of McDonough, McDonough conceded that he could not rule out the possibility that the fatal dose of methadone was ingested *after* the decedent's discharge.

Without direct evidence of when the decedent consumed the fatal dose, the parties largely relied on indirect evidence from which the jury could infer the timing of the decedent's ingestion of methadone. In turn, such indirect evidence required the application of the toxicological concepts and biochemical processes that govern how the human body absorbs, metabolizes, and excretes Narcan and various opiates and opioids. The following evidence relating to those scientific principles was presented through the parties' expert testimony.

For the most part, the parties' experts were in agreement on several fundamental toxicological concepts and biochemical processes. The first important concept about which the experts provided testimony was half-life. A half-life is the time it takes for the concentration of a drug in a person's system to be reduced by one-half. It takes approximately the lapse of five half-lives for a drug to be eliminated completely from a person's system. Because the body does not start to eliminate a drug until it is absorbed, the first half-life of a drug will not begin to run until after the drug is absorbed.

The second concept about which the parties' experts testified was duration of effect. Although related to the concept of half-life, duration of effect "is not equivalent to the half-life of the drug. In some cases, it may be less than the half-life of the drug. In some cases, it may be longer than the half-life of the drug." While half-life refers to the rate at which an absorbed drug is eliminated from the body, duration of effect refers to how long a drug produces physiologic effects.[6] To illustrate this distinction, it is possible that a small concentration of a drug still is in the body after several half-lives, yet that small concentration has ceased producing any effects. The converse also applies in the case of some drugs: "[A drug] may go through a couple half-lives, [but] still be producing some effect . . . ."

The parties' experts also generally agreed regarding the half-lives and durations of effect of Narcan, long-acting narcotics, and short-acting narcotics. The half-life of Narcan, approximately thirty to eighty minutes, is much shorter than the half-lives of both long-acting narcotics and short-acting narcotics. Additionally, the half-lives of short-acting narcotics are shorter than the half-lives of long-acting narcotics. For instance, the plaintiff's expert testified that the half-life of methadone, a long-acting narcotic, ranges from fifteen to fifty-five hours, and the defendant's expert testified that it

could range from eighteen to sixty hours. In contrast, according to the plaintiff's expert, the half-life of heroin, a short-acting narcotic, is two to five hours, and the defendant's expert stated that it is three to four hours.

The durations of effect of Narcan, short-acting narcotics, and long-acting narcotics largely were undisputed as well. The duration of Narcan's antidotal effect begins almost instantaneously upon administration and lasts for thirty to ninety minutes.[7] Generally, Narcan "wears off much sooner than . . . [opiates and opioids such as] heroin . . . or methadone." Heroin "has an effect of four to six hours," while methadone produces "a[n] . . . effect of twelve to twenty-four hours."

The parties' experts also noted, however, that there are some "interindividual" variations in those durations of effect and half-lives because "each individual metabolizes materials differently." Furthermore, the method of administration, the dosage size, and the individual's tolerance for the drug all affect how quickly after ingestion the drug will begin to produce effects. In particular, because intravenous administration delivers the drug directly into the bloodstream, it causes an individual to absorb the drug faster than oral administration and, therefore, produces effects sooner than oral administration. For instance, because oral administration of methadone is "not an instantaneous absorption," "it takes time for the methadone to be absorbed . . . ." Thus, it could take as long as two and one-half hours *after ingestion* for orally administered methadone to be absorbed fully and to reach a peak concentration in the blood.

Having agreed that the effects produced by long-acting and short-acting narcotics generally outlast Narcan's antidotal effects, the parties' experts also agreed that overdose symptoms, including respiratory depression, may return after Narcan wears off. In other words, if the concentration of a narcotic *still is at a toxic level* after Narcan wears off, there will be "a recurrence of the symptoms that prompted . . . [the initial dose of] Narcan." The overdose symptoms reappear because Narcan only temporarily displaces the narcotic from the body's opioid receptors. Once the Narcan has worn off, the remaining concentration of the narcotic reattaches to the opioid receptors.

Despite their agreement on the foregoing principles, the parties' experts disagreed on a critical point. Specifically, their testimony differed with respect to the issue of *how soon* recurring overdose symptoms return after the administration of Narcan. When asked by the defendant's counsel what happens to "patients if they still have a toxic or rising dose of opiate or opioid after the Narcan wears off," Pike answered: "[A]n *hour* after Narcan, they're going to have a recurrence of the symptoms that prompted the paramedics or . . . physician to give the Narcan." (Emphasis added.) Regarding meth-

adone overdoses in particular, Pike further testified that "patients who do overdose on methadone . . . have to be admitted because you're going to be standing there administering Narcan every hour, hour and a half . . . . [T]hey need a continuous infusion of Narcan . . . until they get below that concentration that was causing the overdose effects, and that could take as long as a day . . . ."

In applying those principles to the decedent's case, Pike made the following three observations. First, if a methadone overdose had caused the initial respiratory depression the decedent was experiencing when Hope found her on November 29 at 6:45 p.m., then the respiratory depression should have returned "at about 8 o'clock," i.e., approximately one hour after the paramedics administered Narcan. This conclusion was predicated on the assumption, acknowledged by both parties' experts, that methadone is a *long-acting* narcotic that has a long half-life and duration of effect. Thus, according to Pike, if the concentration of methadone was sufficiently toxic to cause respiratory depression at 6:45 p.m., then it probably still would have been sufficiently toxic when the Narcan wore off at 8 p.m.

Second, according to Pike, the record revealed that the respiratory depression in fact did not return when the Narcan should have been wearing off. To be sure, the respiratory depression did not return *at any point* during the decedent's hospitalization at Lawrence & Memorial. On the contrary, the decedent's vital signs, including her respiration rate and oxygen saturation levels, stabilized at normal levels hours before her discharge. Furthermore, the decedent's condition did not warrant another administration of Narcan at Lawrence & Memorial.

Third, Pike inferred from those first two observations that the decedent's initial respiratory depression was caused by a *short-acting* narcotic, not a *long-acting* narcotic. According to Pike, a short-acting narcotic, by virtue of having a relatively short half-live and duration of effect, would not have caused a recurrence of overdose symptoms after Narcan wore off. That is, there would have been a "rapid decay" of the short-acting narcotic's concentration during Narcan's period of effectiveness, leaving a nontoxic concentration after Narcan wore off. Therefore, the absence of any recurring overdose symptoms after Narcan's period of effectiveness is consistent with an overdose on a short-acting narcotic, not a long-acting narcotic like methadone.

On the basis of those three observations, Pike opined that the decedent had not ingested a *fatal* concentration of methadone *before* she was hospitalized at Lawrence & Memorial. Pike attributed the positive methadone finding in the Lawrence & Memorial drug screen to the methadone that the decedent was administered at Blue Hills. He had "[n]o doubt whatsoever" that the

Blue Hills methadone caused the positive methadone finding on November 29, 2008, notwithstanding the fact that the last Blue Hills dose was administered to the decedent on November 21, 2008. Pike reasoned that the Blue Hills methadone would have been detected on November 29 because five half-lives had not passed since the November 21 dose. In so reasoning, Pike apparently assumed that the Blue Hills methadone's half-life was substantially longer than twenty-four hours, even though he previously had used twenty-four hours as "a reasonable estimate" of methadone's half-life.

Testimony provided by one of the plaintiff's experts, Eric Schwam, controverted Pike's opinion that recurring respiratory depression always presents approximately one hour after the administration of Narcan. An emergency medicine physician who opined mainly on the standard of care,[8] Schwam testified that the "experience of decades of . . . [caring for] patients [overdosing on] long-acting opiates" has shown that "*delayed* respiratory depression can occur . . . ." (Emphasis added.) According to Schwam, "you *don't know when* [the] return of respiratory depression is going to occur. One *might* think that it would occur when the Narcan wears off, and that's a *widely held misconception* . . . . [T]hat's a very easy thing to assume if you know a *little bit* about opiate toxicology, but decades of experience have shown that if that's the way you think and you discharge a patient, a lot of them will be dead the next day." (Emphasis added.)

Schwam also described two specific cases of delayed recurring respiratory depression that he had encountered in his medical practice. In the first case, "[a] patient took an overdose of methadone, was seen in the emergency department, was monitored for six hours, was discharged by the physician, thinking that everything was okay, and the person had recurrence of respiratory depression. Fortunately, they survived." In the second case, which was "very similar to [the decedent's case]," a "patient was discharged home and was found dead the next day." According to Schwam, "these cases . . . have been going on for years, and apparently, they continue to happen." For these reasons, Schwam testified, the appropriate standard of care for a suspected methadone overdose is "monitor[-ing] . . . for *twenty-four hours* for signs of recurrent opiate overdose." (Emphasis added.)

Although Schwam was not a causation expert,[9] the defendant never objected to counsel's questions pertaining to delayed recurring respiratory depression on the ground that they were outside the scope of the subject matter of Schwam's testimony.[10] Moreover, the defendant never moved, on that specific ground, to strike Schwam's answers regarding delayed recurring respiratory depression.[11]

The plaintiff's other expert, McDonough, also disagreed with Pike's assertion that the Blue Hills methadone caused the positive methadone finding in the decedent's drug screen at Lawrence & Memorial. He opined that the Blue Hills methadone was not the same methadone that was detected in the drug screen on November, 29, 2008. McDonough reasoned that the amount of methadone the decedent received at Blue Hills on November 21, 2008, "is basically the smallest dosage you can have" and that the drug screen was conducted "eight and one-half days from the last ingestion of that five milligram tablet . . . ." In so reasoning, McDonough apparently refused to assume, like Pike, that the Blue Hills methadone's half-life was substantially longer than twenty-four hours.

In analyzing the defendant's first challenge to the sufficiency of causation evidence, we begin by setting forth our standard of review. "A party challenging the validity of the jury's verdict on grounds that there was insufficient evidence to support such a result carries a difficult burden. In reviewing the soundness of a jury's verdict, we construe the evidence in the light most favorable to sustaining the verdict. . . . Furthermore, it is not the function of this court to sit as the seventh juror when we review the sufficiency of the evidence . . . rather, we must determine . . . whether the totality of the evidence, including reasonable inferences therefrom, supports the jury's verdict . . . . [I]f the jury could reasonably have reached its conclusion, the verdict must stand, even if this court disagrees with it. . . .

"Two further fundamental points bear emphasis. First, the plaintiff in a civil matter is not required to prove his case beyond a reasonable doubt; a mere preponderance of the evidence is sufficient. Second, the well established standards compelling great deference to the historical function of the jury find their roots in the constitutional right to a trial by jury." (Citations omitted; internal quotation marks omitted.) *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 370–71, 119 A.3d 462 (2015).

"[I]t is [the] function of the jury to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . Because [t]he only kind of an inference recognized by the law is a reasonable one . . . any such inference cannot be based on possibilities, surmise or conjecture. . . . It is axiomatic, therefore, that [a]ny [inference] drawn must be rational and founded upon the evidence. . . . However, [t]he line between permissible inference and impermissible speculation is not always easy to discern. When we infer, we derive a conclusion from proven facts because such considerations as experience, or history, or science have demonstrated that there is a likely correlation between those facts and the

conclusion. If that correlation is sufficiently compelling, the inference is reasonable. But if the correlation between the facts and the conclusion is slight, or if a different conclusion is more closely correlated with the facts than the chosen conclusion, the inference is less reasonable. At some point, the link between the facts and the conclusion becomes so tenuous that we call it speculation. When that point is reached is, frankly, a matter of judgment. . . .

"[P]roof of a material fact by inference from circumstantial evidence *need not* be so conclusive as to *exclude every other hypothesis*. It is sufficient if the evidence produces in the mind of the trier a reasonable belief in the probability of the existence of the material fact. . . . Thus, in determining whether the evidence supports a particular inference, we ask whether that inference is so unreasonable as to be unjustifiable. . . . In other words, an inference need not be compelled by the evidence; rather, the evidence need only be reasonably susceptible of such an inference. Equally well established is our holding that a jury may draw factual inferences on the basis of already inferred facts. . . . Finally, it is well established that a plaintiff has the same right to submit a weak case as he has to submit a strong one. (Citations omitted; emphasis added; internal quotation marks omitted.) *Curran* v. *Kroll*, 303 Conn. 845, 856–57, 37 A.3d 700 (2012).

We next set forth the legal principles governing medical malpractice actions. "[T]o prevail in a medical malpractice action, the plaintiff must prove (1) the requisite standard of care for treatment, (2) a deviation from that standard of care, and (3) a causal connection between the deviation and the claimed injury." (Internal quotation marks omitted.) *Gold* v. *Greenwich Hospital Assn.*, 262 Conn. 248, 254–55, 811 A.2d 1266 (2002). "Generally, expert testimony is required to establish both the standard of care to which the defendant is held and the breach of that standard." (Internal quotation marks omitted.) Id., 255. Likewise, "[e]xpert medical opinion evidence is usually required to show the cause of an injury or disease because the medical effect on the human system of the infliction of injuries is generally not within the sphere of the common knowledge of the lay person." (Internal quotation marks omitted.) *Milliun* v. *New Milford Hospital*, 310 Conn. 711, 725, 80 A.3d 887 (2013).

The defendant does not argue that there is insufficient evidence supporting the jury's findings regarding the appropriate standard of care and Marchiondo's deviation from that standard of care. Thus, we focus on the principles pertaining to causation. "All medical malpractice claims, whether involving acts or inactions of a defendant physician, require that a defendant physician's conduct proximately cause the plaintiff's injuries. The question is whether the conduct of the defendant

was a substantial factor in causing the plaintiff's injury. . . . This causal connection must rest upon more than surmise or conjecture. . . . A trier is not concerned with possibilities but with reasonable probabilities. . . . The causal relation between an injury and its later physical effects may be established by the direct opinion of a physician, by his deduction by the process of eliminating causes other than the traumatic agency, or by his opinion based upon a hypothetical question." (Internal quotation marks omitted.) *Sargis* v. *Donahue*, 142 Conn. App. 505, 513, 65 A.3d 20, cert. denied, 309 Conn. 914, 70 A.3d 38 (2013).

"[I]t is the plaintiff who bears the burden to prove an unbroken sequence of events that tied his injuries to the [defendants' conduct]. . . . This causal connection must be based upon more than conjecture and surmise." (Citations omitted; internal quotation marks omitted.) *Paige* v. *St. Andrew's Roman Catholic Church Corp.*, 250 Conn. 14, 25–26, 734 A.2d 85 (1999). A plaintiff, however, "is *not* required to disprove all other possible explanations for the accident but, rather, must demonstrate that it is more likely than not that the defendant's negligence was the cause of the accident." (Emphasis added.) *Rawls* v. *Progressive Northern Ins. Co.*, 310 Conn. 768, 782, 83 A.3d 576 (2014). "[T]he issue of causation in a negligence action is a question of fact for the trier . . . ." (Internal quotation marks omitted.) *Burton* v. *Stamford*, 115 Conn. App. 47, 87, 971 A.2d 739, cert. denied, 293 Conn. 912, 978 A.2d 1108 (2009).

With the relevant legal framework in mind, we turn to the present case. As an initial matter, we highlight that the parties' dispute regarding causation revolves around the issue of *when* the decedent ingested the fatal dose of methadone. That issue, in turn, depends principally on the application of the toxicological principles governing the relative half-lives and durations of effect of Narcan and long-acting and short-acting narcotics. Thus, we begin by reviewing the expert evidence relating to those toxicological principles.

The thrust of the defendant's argument is that the *undisputed* "physical facts of human biology" and "settled scientific principles" "permit[ted] only one conclusion: If the plaintiff had consumed the fatal dose of methadone before her discharge from the emergency room, there would have been some sign of the drug's resurgent effect before 1:30 a.m." The fundamental flaw in this argument is that the relevant "physical facts" and "scientific principles" *were* disputed at trial. Our review of the record reveals that, although the parties' experts concurred on much of the relevant science, their testimony diverged on a crucial point. As previously explained in considerable detail, the parties' experts disagreed as to *how soon* after receiving Narcan a methadone overdose patient experiences recurring overdose symptoms.

The defendant's causation expert, Pike, testified that recurring methadone overdose symptoms should present, if at all, one hour after the administration of Narcan. This testimony, however, was contradicted directly by the testimony of Schwam, the plaintiff's standard of care expert. In particular, Schwam testified that "*delayed* respiratory depression can occur" in cases of overdoses on long-acting narcotics and that "you *don't know when* [the] return of respiratory depression is going to occur." (Emphasis added.) According to Schwam, "[o]ne *might* think that [the return] would occur when the Narcan wears off, [but] that's a *widely held misconception* . . . ." (Emphasis added.) Schwam recalled from his experience two cases in which delayed recurring respiratory depression occurred. Although the defendant correctly points out that these two cases may not be *exactly analogous* to the decedent's case, they still, nonetheless, are illustrative of the broader point that delayed recurring *can* occur in cases of methadone overdose.

Despite some testimony suggesting that delayed recurring respiratory depression violates certain scientific principles, Schwam testified that it is a medical phenomenon that actually has been observed in practice. Indeed, Schwam opined not only that the phenomenon *can* occur, but that it occurs *despite* what the defendant characterizes as "undisputed" and "settled" scientific principles. Specifically, Schwam testified that "a little bit [of knowledge pertaining to] *opiate toxicology*" has given rise to the "*widely held misconception*" that recurring overdose symptoms return "when the Narcan wears off . . . ." (Emphasis added.) In other words, the evidence did not establish, as the defendant suggests, that delayed onset of recurring respiratory depression was scientifically impossible. On the contrary, the jury heard expert testimony that delayed recurring respiratory depression can occur in methadone overdoses, *even if* such a phenomenon seems to defy the "undisputed" and "settled" toxicological principles of half-life and duration of effect.

"Conflicting expert testimony does not necessarily equate to insufficient evidence." (Internal quotation marks omitted.) *Dallaire* v. *Hsu*, 130 Conn. App. 599, 603, 23 A.3d 792 (2011). Rather, "[w]here expert testimony conflicts, it becomes the function of the trier of fact to determine credibility and, in doing so, it could believe all, some or none of the testimony of either expert." (Internal quotation marks omitted.) *DelBuono* v. *Brown Boat Works, Inc.*, 45 Conn. App. 524, 541, 696 A.2d 1271, cert. denied, 243 Conn. 906, 701 A.2d 328 (1997). It is axiomatic that in cases involving "conflicting expert testimony, the jury is free to accept or reject each expert's opinion in whole or in part." (Internal quotation marks omitted.) *Shelnitz* v. *Greenberg*, 200 Conn. 58, 68, 509 A.2d 1023 (1986).

In the present case, the jury certainly was free to believe and accept the opinion of the plaintiff's expert that the phenomenon of delayed recurring respiratory depression can occur in methadone overdoses. Likewise, it was free to disbelieve and reject the parts of the testimony of the defendant's expert that attempted to refute that phenomenon. Therefore, contrary to the defendant's assertion, the fact that the decedent did not *immediately* experience recurring overdose symptoms one hour after Narcan was administered did not require the jury to conclude that the decedent's overdose on November 29, 2008, was caused by a short-acting narcotic rather than methadone. The jury could have concluded, instead, that the delayed recurring respiratory depression the decedent eventually experienced was consistent with her ingestion of a toxic dose of methadone before her visit to Lawrence & Memorial on November 29, 2008.

Notwithstanding our conclusion that the parties presented conflicting expert testimony on the concept of delayed recurring respiratory depression, the defendant argues that it is improper to consider Schwam's testimony in reviewing the evidence on that concept. Specifically, the defendant argues that "Schwam testified as an expert on the standard of care, not causation. [Thus] [the jury] had no basis to transplant that standard of care testimony to the foreign soil of causation—and no guidance from an expert on how to make it grow there if [it] did." According to the defendant, "[t]he plaintiff put on Dr. Schwam for one purpose; his testimony cannot be used for another and totally different purpose." (Internal quotation marks omitted.) We find this argument unpersuasive.

As an initial matter, we note that it is unclear from the record whether Schwam's testimony was offered solely for standard of care purposes. The plaintiff's disclosure of Schwam's testimony indicated that Schwam would testify on a wide range of subject matter, including how delayed recurring respiratory depression caused the decedent's death.[12] Additionally, the record is silent as to how the plaintiff *actually* offered the testimony and if at that time he in fact limited his offer to standard of care purposes.

Notwithstanding the ambiguity surrounding the plaintiff's proffer of Schwam's testimony, the parties apparently agree that Schwam's testimony was offered only for standard of care purposes.[13] Schwam, nonetheless, was an emergency medicine physician who had experience treating overdose patients and reviewing overdose cases in his capacity as a hospital's director of quality assurance. Thus, his testimony regarding delayed respiratory depression was an "expert" opinion in the sense that it was based on his expertise and experience in practicing emergency medicine, a field apparently requiring knowledge of the toxicological and pharmaco-

logical properties of narcotics. The fact that the parties' dispute over the standard of care *and* causation *both* centered primarily on those properties reveals that the issues of standard of care and causation clearly were intertwined in the present case.

Even if Schwam's testimony was offered strictly for standard of care purposes, the defendant failed to pursue any preemptive or remedial measures that would have precluded or limited Schwam's testimony on the issue of delayed recurring respiratory depression. The defendant did not file a motion in limine on that issue; it did not object to questions on that issue asked of Schwam by the plaintiff's counsel;[14] it did not move to strike Schwam's testimony regarding that issue;[15] and it did not request a limiting instruction directing the jury to consider Schwam's testimony on that issue only for standard of care purposes. See *State* v. *Dews*, 87 Conn. App. 63, 69, 864 A.2d 59 (rejecting claim that trial court, sua sponte, should have "stricken . . . testimony and offered a limiting instruction as to its use" because "defendant did not object to . . . testimony, he failed to seek to have the testimony stricken . . . he did not request a limiting instruction . . . [and] he [did not] take exception to the court's failure to give a limiting instruction"), cert. denied, 274 Conn. 901, 876 A.2d 13 (2005).

Accordingly, the court never instructed the jury that it should disregard Schwam's testimony on delayed recurring respiratory depression or that it should consider such testimony only for standard of care purposes. In the absence of any such instruction from the court, the evidence regarding delayed recurring respiratory depression was before the jury for it to use for any purpose, including causation. See *Curran* v. *Kroll*, supra, 303 Conn. 863–64 ("We also are not persuaded by the . . . argument that the Appellate Court improperly concluded that evidence of the decedent's telephone call to [the defendant physician] would support an inference that the decedent would have called [the defendant] about her leg pain if she had been warned about it because the evidence was not presented for that purpose . . . . This evidence was admitted in full, without limitation. In the absence of any limiting instruction, the jury was entitled to draw *any* inferences from the evidence that it reasonably would support." [Emphasis added.]); see also *State* v. *Carey*, 228 Conn. 487, 496, 636 A.2d 840 (1994) ("If [inadmissible] evidence is received without objection, it becomes part of the evidence in the case, and is usable as proof to the extent of the rational persuasive power it may have. The fact that it was inadmissible does not prevent its use as proof so far as it has probative value. . . . This principle is almost universally accepted. . . . The principle applies to any ground of incompetency under the exclusionary rules." [Internal quotation marks omitted.]).

The defendant also argues that, even if the jury could consider Schwam's testimony for causation purposes, the combined expert testimony of Schwam and McDonough still was insufficient to establish causation. Specifically, the defendant argues that "[e]ven if the plaintiff could dress up standard of care testimony in causation clothes, Dr. Schwam did not opine that *delayed* respiratory depression caused the decedent's death. No [expert] witness did." (Emphasis altered.) The defendant also contends that McDonough's opinion as to the decedent's cause of death was inadequate because McDonough could not determine if the decedent consumed the fatal dose of methadone before her discharge from Lawrence & Memorial. Thus, the gravamen of the defendant's challenge to the expert evidence on causation is that the opinions of McDonough and Schwam were deficiently unspecific. We are unpersuaded.

The defendant correctly states that a plaintiff in a medical malpractice action generally must prove causation with expert testimony. See *Milliun* v. *New Milford Hospital*, supra, 310 Conn. 725. We disagree with the defendant, however, that the cumulative effect of the expert evidence and other evidence presented in this case did not establish a causal connection between the defendant's negligence and the decedent's death.

First, although McDonough did not testify specifically that the respiratory depression responsible for the decedent's death was "delayed," he did opine that the cause of death was respiratory depression resulting from methadone toxicity. McDonough also provided subsequent testimony indicating that the "presumed time to onset" of respiratory depression in methadone overdoses "could be *quite long*" because "the *respiratory depression* comes on *much later* than the pain relief." (Emphasis added.) Furthermore, expert testimony provided by Schwam, which we presume the jury credited, described in considerable detail the phenomenon of delayed recurring respiratory depression in methadone overdoses. The occurrence of fatal respiratory depression hours after the decedent's consumption of methadone was consistent with the expert testimony provided by McDonough and Schwam. Thus, when all of the expert testimony is considered together, the jury reasonably could have inferred that the decedent succumbed to delayed respiratory depression.

Second, the fact that McDonough could not determine the specific time at which the decedent consumed the fatal dosage of methadone does not render his opinion inadequate. Rather, the specific timing of the decedent's ingestion of methadone was a fact that the plaintiff could have proven with circumstantial evidence. See *Shelnitz* v. *Greenberg*, supra, 200 Conn. 66 ("[in a medical malpractice action] [c]ausation may be proved by circumstantial evidence *and* expert testi-

mony" [emphasis added; internal quotation marks omitted]). On direct examination, the plaintiff asked McDonough whether it was his opinion that, if the decedent had consumed methadone before her discharge but not afterward, the methadone consumed before her discharge on November 29, 2008, caused the decedent's death. McDonough answered that question in the affirmative. In answering that question, McDonough clearly had to *assume* that the decedent ingested methadone only before, and not after, her discharge. In other words, McDonough offered a conditional opinion that the methadone consumed before the decedent's discharge caused her death, the condition being that the plaintiff prove that the methadone in fact was consumed before, and not after, her discharge. McDonough's testimony was not the exclusive means of proving that fact.

Having determined that the jury reasonably could have credited expert testimony supportive of the phenomenon of delayed recurring respiratory depression, we now examine the other evidence relating to when the decedent consumed the fatal dose of methadone. Our review of the record leads us to conclude that there was sufficient evidence from which the jury could infer, without resorting to speculation, that the decedent consumed the fatal dose of methadone before her discharge.[16]

In particular, the jury was presented with the following relevant evidence. At approximately 6:45 p.m. on November 29, 2008, the decedent was found to be suffering from symptoms that are consistent with an opiate or opioid induced overdose. The decedent's improvement in response to a dose of Narcan confirmed that she had been experiencing an overdose on an opioid or opiate. The paramedics who treated the decedent were able to determine that the decedent's "current medications" included methadone. Hope searched his home upon finding the decedent overdosing on November 29, and he did not find any drugs, drug paraphernalia, or evidence of drug use.

There were conflicting accounts as to whether the decedent admitted to taking methadone, but the jury certainly was free to credit the account wherein the decedent told the emergency room nurses that she took methadone and not heroin. Critically, a toxicology screen performed in the emergency room on November 29, 2008, detected the presence of methadone in the decedent's urine. The jury heard expert testimony that the positive finding for methadone in that screen could not have been caused by the therapeutic doses of methadone the decedent received eight days earlier.

From the time she was discharged, 11:53 p.m. on November 29, 2008, until 1:30 a.m. on November 30, 2008, the evidence showed that the decedent was in the company of Hope, who did not observe her ingest any more drugs. At some point between 1:30 a.m. and

9:45 a.m., the decedent experienced another episode of respiratory depression, which the jury could have found to be the type of delayed recurring respiratory depression that Schwam opined is consistent with methadone overdoses. Hope testified that he did not hear any movement from the decedent between 1:30 a.m. and 9:45 a.m. on November 30, unlike the night of November 29, when he had heard the decedent use the microwave in his kitchen. Hope found the decedent's body in the same position in which it had been when he last saw the decedent at 1:30 a.m.

The medical examiner determined that the concentration of methadone present in the decedent's blood at the time of death was at a toxic level. The decedent's death occurred approximately seven to fifteen hours after she initially overdosed on November 29, 2008.

Hope and law enforcement officials searched Hope's home on November 30, 2008, and did not find any evidence relating to drug activity. In addition, Geyer, an investigator with the medical examiner's office, did not find any drugs, drug paraphernalia, or signs of drug use on or near the decedent's body.

Construing all of the evidence in the light most favorable to sustaining the verdict, as we must; *Saint Bernard School of Montville, Inc.* v. *Bank of America*, 312 Conn. 811, 834, 95 A.3d 1063 (2014); we conclude that it is sufficient to support the jury's finding that the decedent consumed a fatal dose of methadone before she was brought to the emergency room at Lawrence & Memorial on November 29, 2008.

B

In its second challenge to the sufficiency of causation evidence, the defendant contends that "there is a [another] missing link in the plaintiff's causal chain. . . . [T]he jury could only guess whether the decedent would have been admitted to [Lawrence & Memorial] if Dr. Marchiondo had not discharged her." According to the defendant, in order to prove that Marchiondo's negligence caused the decedent's death, the plaintiff was required to present evidence regarding "[Lawrence & Memorial's] admission standards . . . and whether the decedent met them." Because the plaintiff failed to present such evidence, the defendant contends, the jury reasonably could not have found that the defendant caused the decedent's death. We disagree.

The defendant's second sufficiency challenge suffers from the basic flaw of misunderstanding Schwam's testimony regarding the applicable standard of care. As the defendant argues, Schwam did testify initially that the standard of care applicable to possible methadone overdoses required Marchiondo to "*admit* [the decedent] to the hospital for continuous monitoring . . . for a minimum of twenty-four hours." (Emphasis added.) Schwam subsequently clarified, however, that

the applicable standard of care only required Marchiondo "to monitor her. He needed to *ideally* admit her to an intensive care unit, *but certainly* to *monitor* her for twenty-four hours for signs of recurrent opiate overdose." (Emphasis added.) The jury, of course, could have accepted the part of Schwam's testimony indicating that *monitoring* was required and rejected the part suggesting *admittance* was required.

Consequently, in order to prove causation, the plaintiff needed to show only that the decedent could have been monitored sufficiently for twenty-four hours, not admitted for that period of time. Zambarano, an emergency room nurse at Lawrence & Memorial, testified that the decedent was monitored in a room called the "observation room" during her hospitalization. Nurses assigned to the observation room monitor the vital signs of patients in that room both in person and through remote telemetric monitoring displays at a nearby nurses' station. Thus, nurses can respond immediately to a crash in the vital signs of an observation room patient. According to Zambarano, patients can stay overnight in the observation room. Alternatively, Zambarano testified, patients can be monitored in less acute areas, such as hallway beds. With that testimony, along with the evidence that the decedent was "told that she was here for the night," the jury reasonably could have inferred that it was more likely than not that the decedent could have been monitored medically for twenty-four hours at Lawrence & Memorial.

Accordingly, in construing all of the evidence in the light most favorable to sustaining the verdict, as we must; *Saint Bernard School of Montville, Inc.* v. *Bank of America*, supra, 312 Conn. 834; we conclude that there was sufficient evidence supporting the jury's finding that the defendant's negligence caused the decedent's death.

## II

## SUFFICIENCY OF EVIDENCE SUPPORTING JURY'S AWARD OF DAMAGES

The defendant's second claim is that the plaintiff failed to present sufficient evidence supporting the jury's award of $150,000 in damages for the destruction of the decedent's capacity to carry on and enjoy life's activities. Specifically, the defendant contends that a plaintiff seeking damages for the destruction of a decedent's capacity to carry on and enjoy life's activities must present evidence of the decedent's life expectancy. According to the defendant, the plaintiff failed to present evidence of the decedent's life expectancy in the present case, and, therefore, the jury's award of damages for the destruction of the decedent's capacity to carry on and enjoy life's activities was "speculative and unreasonable." We disagree.

The following additional facts and procedural history

are necessary to our resolution of the defendant's second claim. At trial, the plaintiff presented evidence of the decedent's (1) age, (2) health, (3) physical condition, and (4) habits and activities. Regarding the decedent's age, a photograph of the decedent's driver's license, which contained the decedent's date of birth, was admitted into evidence.

Regarding the decedent's health, the plaintiff offered some of the decedent's medical records. Those records indicated that, in addition to polysubstance abuse, the decedent suffered from diabetes, hypothyroidism, high cholesterol, high blood sugar, anxiety, and depression. The records also indicated that, since 2000, the decedent had completed several inpatient and outpatient substance abuse treatment programs and had been hospitalized several times for diabetes related complications.

Regarding the decedent's physical condition, McDonough's autopsy report, wherein he detailed the observations of his external and internal examinations of the decedent, was admitted into evidence. McDonough testified that he observed "no evidence of acute trauma" as a result of his external examination of the decedent's body. Furthermore, McDonough's internal examination revealed no evidence of disease afflicting the decedent's cardiovascular, hepatobiliary, lymphoreticular, gastrointestinal, genitourinary, and central nervous systems, nor was there evidence of disease afflicting the decedent's head, neck, internal genital organs, or abdominal and chest cavities. McDonough's examination did reveal, however, that the decedent's thyroid exhibited signs of chronic inflammation and that her lungs were congested with fluid.

Regarding the defendant's habits and activities, as previously set forth, there was considerable evidence presented of the decedent's lengthy struggle with polysubstance abuse and her alternating periods of sobriety and relapse. In addition to her drug problems, however, there was evidence presented regarding the decedent's other habits and activities. The decedent's father, James Procaccini, testified that in the summer of 2008 the decedent was a "very happy person" who was "able to function in life very well." According to her father, the decedent helped him and his wife with household chores, submitted "an awful lot" of job applications, and attended Alcoholics Anonymous meetings. The "bright spot in [the decedent's] life" at that time, however, was helping her father and mother care for her two year old twin niece and nephew. Prior to the summer of 2008, the decedent had graduated from the University of Vermont with a bachelor of science degree and had taken a cross-country trip to Mount Rainier in Washington.

Following the jury's return of a plaintiff's verdict, the defendant filed a motion to set aside the verdict on

the ground that the jury's award of damages for the destruction of the decedent's capacity to carry on and enjoy life's activities was "speculative." Specifically, the defendant argued that the plaintiff failed to present evidence of "[h]ow long the plaintiff likely would have lived," and, therefore, "[w]ithout a life expectancy table, or some other evidence on this topic," the jury's award "[could not] stand." The court denied the defendant's motion to set aside the verdict.

We begin our analysis by outlining our standard of review. "The standard of review governing our review of a trial court's denial of a motion to set aside the verdict is well settled. The trial court possesses inherent power to set aside a jury verdict which, in the court's opinion, is against the law or the evidence. . . . [The trial court] should not set aside a verdict where it is apparent that there was some evidence upon which the jury might reasonably reach [its] conclusion, and should not refuse to set it aside where the manifest injustice of the verdict is so plain and palpable as clearly to denote that some mistake was made by the jury in the application of legal principles . . . . Ultimately, [t]he decision to set aside a verdict entails the exercise of a broad legal discretion . . . that, in the absence of clear abuse, we shall not disturb." (Internal quotation marks omitted.) *Kumah* v. *Brown*, 160 Conn. App. 798, 803, 126 A.3d 598, cert. denied, 320 Conn. 908, 128 A.3d 953 (2015).

We now turn to the legal principles governing damages awards in wrongful death actions. "In actions for injuries resulting in death, a plaintiff is entitled to 'just damages' together with the cost of reasonably necessary, medical, hospital and nursing services, and including funeral expenses.' General Statutes § 52-555. 'Just damages' include (1) the value of the decedent's lost earning capacity less deductions for her necessary living expenses and taking into consideration that a present cash payment will be made, (2) *compensation for the destruction of her capacity to carry on and enjoy life's activities in a way she would have done had she lived*, and (3) compensation for conscious pain and suffering." (Emphasis added.) *Katsetos* v. *Nolan*, 170 Conn. 637, 657, 368 A.2d 172 (1976).

Regarding compensation for the destruction of a decedent's capacity to carry on and enjoy life's activities, our Supreme Court has stated the following: "[T]he parties in a death action are entitled to attempt to present an *over-all picture of the decedent's activities* to enable the jury to make an informed valuation of the total destruction of his capacity to carry on life's activities. . . . So, for example, evidence bearing on *how pleasurable the decedent's future might have been* is admissible . . . as is evidence as to the decedent's *hobbies* and *recreations*." (Citations omitted; emphasis added; internal quotation marks omitted.) *Waldron* v.

*Raccio*, 166 Conn. 608, 616–17, 353 A.2d 770 (1974); id., 617 (evidence of "decedent's attachment to his family" relevant to claim for destruction of capacity to carry on and enjoy life's activities); see also *Katsetos* v. *Nolan*, supra, 170 Conn. 658 (evidence that decedent "was happily married," "had four children," "was a very happy person and in good health," "was a dedicated mother and homemaker," "[was] active in many outside activities," "was a state-licensed hairdresser," and had worked in pizza restaurant and office relevant to her capacity to enjoy life's activities); cf. *Bruneau* v. *Quick*, 187 Conn. 617, 635–36, 447 A.2d 742 (1982) (in personal injury action for surgeon's malpractice, evidence that plaintiff no longer could undertake ice skating, sailing, ballroom and jazz dancing, and gardening as she had before botched surgery was relevant to her "ability to carry on and enjoy certain activities").

A claim for the destruction of a decedent's capacity to carry on and enjoy life's activities requires proof of the decedent's life expectancy. See *Sims* v. *Smith*, 115 Conn. 279, 286, 161 A. 239 (1932) ("damages based upon the loss to the estate of a decedent by his death necessarily involves a consideration of the probable duration of his life"); cf. *Acampora* v. *Ledewitz*, 159 Conn. 377, 384–85, 269 A.2d 288 (1970) (in personal injury action, trial court erred in allowing jury to consider damages for permanent pain and suffering because "no evidence was introduced as to [plaintiff's] life expectancy").

With respect to the *type* of evidence that can be used to prove one's life expectancy, our Supreme Court has stated the following: "A mortality table[17] is *not* the exclusive evidence admissible to establish the expectancy of life, since *age*, *health*, *habits* and *physical condition* may afford evidence thereof." (Emphasis added; footnote added.) *Johnson* v. *Fiske*, 125 Conn. 445, 449, 6 A.2d 354 (1939). "[Mortality] tables only give the average of a large number of lives, and in the individual case the expectancy may be higher or lower than the average. While generally held admissible, they are *not conclusive*, *nor are they the exclusive evidence* admissible in proof of that fact, which the jury may determine from other evidence . . . ." (Emphasis added.) *Donoghue* v. *Smith*, 114 Conn. 64, 66, 157 A. 415 (1931); see also *Tampa* v. *Johnson*, 114 So. 2d 807, 810 (Fla. App. 1959) ("[a] jury is *not bound* by mortality tables, but these constitute *only one of many factors* that *may be* considered in estimating life expectancy" [emphasis added]); *Glover* v. Berger, 72 Wyo. 221, 250, 263 P.2d 498 (1953) ("[d]irect evidence as to plaintiff's expectancy of life, however, is not essential, but the jury may determine such fact from their own knowledge and from the proof of the age, health, and habits of the person and other facts before them" [internal quotation marks omitted]).

Use of a mortality table is not the exclusive means of proving life expectancy because "our rule for assessing

damages in death cases gives no precise mathematical formulas for the jury to apply. . . . [T]he assessment of damages in wrongful death actions *must* of necessity represent a *crude* monetary forecast of how the decedent's life would have evolved." (Citations omitted; emphasis added; internal quotation marks omitted.) *Katsetos* v. *Nolan*, supra, 170 Conn. 657. Indeed, "[t]he life expectancy of the deceased, for the purpose of assessing damages in a wrongful death action, is a *question of fact for the jury to decide* . . . ." (Emphasis added.) 22A Am. Jur. 2d 353, Death § 221 (2013).

Consequently, "jurors may determine such fact *from their own knowledge* and from the proof of the age, health, and habits of the person and other facts before them." (Emphasis added.) 29A C.J.S. 493, Damages § 141 (2012); see also 22A Am. Jur. 2d, supra, § 349, pp. 469–70 ("if age, sex, health, and mental capacity are proven, the jury is entitled to determine from these facts and circumstances . . . in its sound judgment . . . the decedent's life expectancy, without resort to mortality tables"). "The law does not require the production of . . . life expectancy tables whenever there is an issue of life expectancy, and does not regard them as essential to the establishment of that issue or to the recovery of damages based on life expectancy." 29A Am. Jur. 2d 723, Evidence § 1383 (2013).

Thus, insofar as the defendant argues that the plaintiff's proof of the decedent's destroyed capacity to enjoy life's activities is insufficient because he did not present "government mortality tables," we disagree. As previously addressed in considerable detail, the plaintiff presented substantial evidence of the decedent's age, health, physical condition, and habits, all of which are relevant to determining life expectancy. The decedent's age was established by her driver's license; the decedent's sundry illnesses were established by her medical records; the decedent's physical condition at the time of her death was expounded in McDonough's autopsy report and trial testimony; and the jury was familiar with the decedent's enduring drug habits. Moreover, the jury heard testimony from the decedent's father regarding the activities in which the decedent enjoyed partaking, including her strong attachment to her niece and nephew. *Waldron* v. *Raccio*, supra, 166 Conn. 616–17 (decedent's "attachment to his family" relevant to his capacity to enjoy life's activities). Thus, the jury reasonably could have made a " 'crude . . . forecast' "; *Katsetos* v. *Nolan*, supra, 170 Conn. 657; of the decedent's life expectancy from its own knowledge and from proof of the decedent's age, health, physical condition, and habits.

In light of the foregoing evidence that the plaintiff presented with respect to the decedent's life expectancy and activities that she enjoyed, we conclude that the jury's award of damages for the destruction of the dece-

dent's capacity to carry on and enjoy life's activities was not unreasonable or speculative. Accordingly we conclude that the court did not abuse its discretion in refusing to set aside the jury's award of damages for the destruction of the decedent's capacity to carry on and enjoy life's activities.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Lawrence & Memorial Hospital, Inc., Lawrence & Memorial Corporation, and Thomas E. Marchiondo, a physician, were initially named as defendants in this action. Prior to trial, the plaintiff withdrew the action as against Lawrence & Memorial Hospital, Inc., and Lawrence & Memorial Corporation, and filed an amended complaint naming Emergency Medicine Physicians of New London County, LLC, as a defendant. After filing this appeal, but before oral argument was heard, the plaintiff withdrew the claims as against Marchiondo, who died before trial began. Accordingly, because those three other defendants are not involved in this appeal, we refer to Emergency Medicine Physicians of New London County, LLC, as the defendant throughout this opinion.

[2] The jury heard expert testimony explaining the differences between opiates and opioids. An opiate is a "naturally occurring" narcotic that is derived from poppy plants. There are four opiates: opium, heroin, codeine, and morphine. An opioid is a "synthetic or semisynthetic narcotic . . . ." Examples of well-known opioids include oxycodone, hydrocodone, fentanyl, and methadone.

[3] Marchiondo also diagnosed the decedent with pneumonia.

[4] The parties stipulated at trial that Marchiondo was "an employee, agent, representative, or servant of [the defendant] and acting within and pursuant to the scope of his employment, agency, representation, and authority with [the defendant]." Accordingly, the court instructed the jury: "If you find that . . . Marchiondo's treatment of [the decedent] was negligent, that is, deviated from the applicable standard of care, and that negligence was a substantial factor in bringing about her death, then [the defendant] is responsible for . . . Marchiondo's conduct and, in that event, you should find against [the defendant]."

[5] The court reserved decision on the defendant's renewed motion for a directed verdict when it granted the defendant's motion for an extension of time to file other postverdict motions. Subsequent to the court's granting of the motion for an extension of time, the defendant filed a motion to set aside the jury's verdict, wherein the defendant again renewed its motion for a directed verdict. The trial court denied both the motion to set aside and the motion for a directed verdict, the latter of which was denied nunc pro tunc.

[6] Throughout trial, it appears that the parties, and even their expert witnesses, occasionally blurred the distinction between half-life and duration of effect. Indeed, although he warned against "confus[ing] duration of effect with half-life," Pike himself provided a definition of "half-life" that seemingly incorporated the concept of the duration of effect: "half-life . . . has . . . to do with *how long* th[e] physiologic response that the drug is producing will be *effective* . . . ." (Emphasis added.) As another example, when asked by the defendant's counsel to provide the "durational effect" of Narcan, McDonough replied: "It would be similar to the *half-life* of thirty to eighty minutes." (Emphasis added.)

Nevertheless, it is of little importance whether the technical scientific distinction between half-life and duration of effect was preserved consistently at trial. As explained previously in greater detail, the crucial issue at trial pertained to Narcan's relative *effectiveness* as compared to both long-acting and short-acting narcotics. The parties' experts agreed that "[Narcan's] effectiveness is *much shorter* than the effect of the longer-acting [and] even short-acting narcotic[s] . . . ." (Emphasis added.) Moreover, as also explained previously in greater detail, it was undisputed that the half-lives and durations of effect of short-acting narcotics are shorter than those of long-acting narcotics.

[7] The defendant, but not the plaintiff, asserts that the "parties stipulated that the maximum effective duration of the Narcan given to the decedent was *ninety* minutes." (Emphasis added.) Although the record reveals that the plaintiff *offered* to stipulate that the effective duration of Narcan is

"twenty to ninety minutes," neither the defendant nor the court accepted this proposed stipulation. Furthermore, the court never submitted any such stipulation to the jury.

[8] Although the defendant does not challenge the jury's finding with respect to the standard of care, we note that Schwam opined that Marchiondo's treatment of the decedent deviated from the appropriate standard of care for a possible methadone overdose. Schwam testified that Marchiondo improperly ruled out methadone as a potential cause of the decedent's overdose because there was "sufficient evidence to at least raise the possibility that the overdose was . . . partly methadone." Consequently, having wrongly excluded methadone, Marchiondo also failed to provide the decedent with the appropriate care for a methadone overdose, which is "monitor[ing] . . . for twenty-four hours for signs of recurrent opiate overdose."

[9] The plaintiff conceded at oral argument before this court that Schwam's testimony was offered only for standard of care purposes.

[10] The defendant did file two motions in limine regarding the scope of Schwam's testimony. The second, which sought to preclude Schwam from testifying on the "effective duration of Narcan," effectively was granted when the court stated that it would sustain any "objection that fairly implicates . . . [the] effective duration of Narcan." The first motion sought to preclude Schwam from testifying regarding the standard of care with respect to Marchiondo's diagnosis of pneumonia. The plaintiff agreed to not elicit any testimony from Schwam regarding the pneumonia diagnosis. Neither of those two motions, however, sought to preclude or limit in any respect Schwam's testimony regarding delayed recurring respiratory depression.

[11] The defendant did move to strike the following testimony from Schwam's direct examination: "Well, [the belief that respiratory depression would return when Narcan wears off is] a very easy thing to assume if you know a little bit about opiate toxicology, but decades of experience have shown that if that's the way you think and you discharge a patient, a lot of them will be dead the next day." The court, however, denied the motion to strike. Critically, the defendant's stated ground for the motion to strike was that Schwam's answer was *not responsive* to the question asked by the plaintiff's counsel. At no point did the defendant move to strike Schwam's testimony on the ground that it was outside the scope of the plaintiff's offer of Schwam's testimony for standard of care purposes.

[12] Specifically, the plaintiff stated in the disclosure that Schwam would testify as to (1) "all subject matter arising from his expertise in the field of emergency medicine, including the treatment of patients suspected of suffering from drug overdose"; (2) "all subject matter arising from his education, training, and experience"; (3) "the care and treatment [the decedent] received from the defendant during her emergency department admission on November 29, 2008"; (4) "the decedent's medical history, her presenting symptoms, the course of treatment she received by the defendant, the diagnosis provided, the laboratory results, and the medical course that could and should have occurred, but did not"; and (5) "certain aspects of the testimony provided by the defendant's experts."

In outlining the subject matter of Schwam's testimony, the disclosure also stated: "Please see the attached five page opinion letter . . . that capture[s] the expected subject matter of his expected testimony." In the attached opinion letter, Schwam opined, among other things, that (1) "when Narcan is administered to counteract methadone, the Narcan usually wears off long before the methadone, and patients may seem well for several hours, only to relapse and become unconscious much later"; (2) "when the effects of Narcan [administered to the decedent] wore off, the effects of methadone returned and she suffered unresponsiveness and fatal respiratory depression; and (3) "to a reasonable medical certainty, it can be determined that the delayed toxic effects of the methadone caused [the decedent's] death."

[13] See footnote 9 of this opinion.

[14] See footnote 10 of this opinion.

[15] See footnote 11 of this opinion.

[16] The defendant's reliance on *Paige* v. *St. Andrew's Roman Catholic Church Corp.*, supra, 250 Conn. 14, is unavailing. The defendant cites *Paige* as support for its position that the jury in the present case resorted to improper speculation in finding that the defendant caused the plaintiff's death. We are unpersuaded by the defendant's reliance on *Paige* because it is distinguishable from the present case.

In *Paige*, our Supreme Court held that there was insufficient evidence supporting the jury's finding that the defendant caused the plaintiff's injuries. Id., 17. The plaintiff in *Paige* was cleaning a boiler located in the defendant's

church when *someone* activated the boiler, causing the plaintiff to sustain serious burn injuries. Id., 16–17. There was no direct evidence presented at trial that affirmatively established that the person who activated the boiler was an employee, servant, or agent of the defendant. Id., 34. Thus, the plaintiff's case relied principally on two alternative theories of negligence: (1) the defendant failed to supervise and instruct *its employees*, *servants*, *and agents* with respect to the boiler's operation; and (2) the defendant failed to restrict *public* access to the boiler's controls. Id., 27.

In returning a plaintiff's verdict, the jury answered several interrogatories regarding the plaintiff's theories of negligence. Id., 26–27 n.13. Its responses to the interrogatories indicated that it had found that the defendant was *not* negligent in failing to restrict *public* access to the boiler's controls. Id., 27–28. It did find, however, that the defendant was negligent in failing to supervise and instruct *its employees*, *agents*, *and servants* with respect to the boiler's operation. Id., 27. Notwithstanding its finding that the defendant negligently supervised and instructed its employees, agents, and servants, the jury indicated in another interrogatory that the defendant's custodian was not the person who activated the boiler. Id., 27 n.13.

The jury's responses to the interrogatories were central to our Supreme Court's analysis of the sufficiency of the evidence on causation. Id., 28–31. Specifically, the court reasoned that those responses indicated that the jury's finding of negligence "was limited to the manner in which [the defendant] dealt with *its own employees*, *servants and agents*." (Emphasis added.) Id., 28. Therefore, "[i]n order for there to have been a causal connection between the defendant's negligent conduct and the plaintiff's injuries . . . it would have had to have been an employee, agent or servant of the defendant who activated the [boiler]. . . . [T]he converse [was] equally true . . . . [T]he defendant's conduct [could not have been] causally linked to the plaintiff's injuries if the [boiler] was activated by a person who was *not* an employee, agent or servant of the defendant." (Emphasis in original.) Id., 28–29.

In reviewing the sufficiency of the evidence on causation, the court in *Paige* examined only the evidence relating to whether the person who activated the boiler was an employee, servant, or agent of the defendant. The plaintiff's evidence unquestionably suggested that there was *only one* employee, agent, or servant of the defendant who was near the boiler controls at the time of the accident and who knew how to use those controls—the defendant's custodian. Id., 24, 34. As previously explained, however, the jury's response to an interrogatory indicated that it specifically found that the defendant's custodian was not the person who activated the boiler. Id., 27 n.13. Thus, the Supreme Court held that the "jury could not have concluded that it was an employee of the defendant who had activated [the] boiler . . . ." Id., 34.

The defendant argues that *Paige* guides our resolution of its sufficiency claim. Specifically, it contends that "[l]ike the possibility that a member of the public may have turned on the church boiler [in *Paige*], nothing . . . in this case [eliminated] the possibility that the decedent took the fatal dose [of methadone] after she left the emergency room." We are not persuaded by the defendant's analogy.

We conclude that *Paige* presented a distinct situation involving a logical inconsistency in the jury's verdict. In responding to a set of highly detailed and specific interrogatories, the jury revealed that its finding of negligence was based solely on the defendant's conduct with respect to its employees, agents, and servants. Yet, its responses to those interrogatories also revealed that it exonerated the only employee of the defendant who, according to the plaintiff's evidence, could have activated the boiler. There are no jury interrogatories in the present case that reveal a similar inconsistency in the jury's verdict, nor is any such inconsistency otherwise apparent. Furthermore, the plaintiff in *Paige* failed to present *any* evidence from which the jury reasonably could infer that the person who activated the boiler was an employee, agent, or servant of the defendant. In the present case, however, there is ample evidence from which the jury could infer that the decedent consumed the lethal dose of methadone before her discharge. In particular, there was evidence that the decedent exhibited opioid overdose symptoms prior to her discharge, that her urine tested positive for methadone at the time of her hospitalization, and that the delayed respiratory depression she experienced after her discharge was consistent with the consumption of a toxic dose of methadone prior to her discharge.

[17] A mortality table, also termed an "actuarial table," is "[a]n organized chart of statistical data indicating life expectancies for people in various categories . . . ." Black's Law Dictionary (10th Ed. 2014).