711 A.2d 1370 (1998)
312 N.J. Super. 579
Reverend Julius BROWN, General Administrator and Administrator ad Prosequendum of the Estate of Jeannette Clemons, Deceased, Plaintiff-Respondent/ Cross-Appellant,
v.
KENNEDY MEMORIAL HOSPITAL-UNIVERSITY MEDICAL CENTER (CHERRY HILL DIVISION), Dr. Devlin, and Dr. Shinder, Defendants, and
Larry Cohen, D.O., Michael Abraham, D.O., and Abraham & Cohen, a legal entity, Defendants-Appellants/Cross-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued January 21, 1998.
Decided June 25, 1998.
*1372 Stanley P. Stahl, Mount Laurel, for defendant-appellant/cross-respondent Larry Cohen in A-5137-95T5 (Mr. Stahl and Sharon K. Galpern, Voorhees, on the brief).
Robert E. Paarz, Pleasantville, for defendant-appellant/cross-respondent Michael Abraham in A-5192-95T5 (Paarz, Master, Koernig, Crammer, O'Brien & Bishop, attorneys; Mary Ann C. O'Brien, on the brief).
Thomas F. McGuire, Sr., Cherry Hill, for plaintiff-respondent/cross-appellant Julius Brown in both appeals.
Before Judges LONG, KLEINER and KIMMELMAN.
*1371 The opinion of the court was delivered by
KLEINER, J.A.D.
This medical malpractice wrongful death action has had a torturous history. A complaint was initially filed on December 4, 1989, by the Reverend Julius Brown (plaintiff) following the death of his daughter, Jeannette Clemons,[1] (Jeannette), on October 18, 1988, after her appendix ruptured causing peritonitis. Plaintiff, as general administrator and administrator ad prosequendum, contended that defendants Dr. Michael Abraham (Abraham), Dr. Larry Cohen (Cohen) and other named defendants[2] who treated Jeannette deviated from the expected standard of care, focusing upon an alleged improper diagnosis, thus exposing each to a charge of medical malpractice. Thereafter, plaintiff, with leave of court, filed a fourth amended complaint focusing upon a deviation in the standard of care, post-surgery, resulting in Jeannette's death.
Prior to her death, Jeannette, age fortynine, who was married but separated from her husband, and who was a licensed practical nurse, moved into her parent's home to care for her mother, Bertha Brown. Her mother died in August 1987. Plaintiff, then age eighty-six, who served as an unpaid parttime Baptist pastor, became despondent following his wife's death. Thus, Jeannette continued to reside with plaintiff and resided with him immediately before her final illness. At trial, it was established that Jeannette assisted her father in his clerical work, provided him with transportation, prepared meals, did laundry, shopped, and cleaned the house.[3]
Early in the morning of September 14, 1988, Jeannette suffered excruciating pain in her right abdomen, and plaintiff took her to the emergency room at JFK. Devlin diagnosed *1373 viral gastroenteritis and prescribed medication but did not admit her. According to Devlin, the reported pain was epigastric, not in the lower gastrointestinal tract. However, her pain continued and she returned to JFK on September 15, 1988, at 5:30 a.m., when she was admitted by a resident. Jeannette came under the care of Abraham at 10:00 a.m. on that date.
Plaintiff visited Jeannette every day. On September 18, he was summoned by doctors to give permission for surgery because Jeannette refused to sign. Plaintiff found Jeannette "like in a state of ecstasy," and not "of herself."
After the surgery, Jeannette was very sick, but plaintiff could not tell if she was in pain because she never communicated. However, as part of plaintiff's case, a church deacon, Solomon Bradley, testified that he visited Jeannette at JFK, saw her grimace as if in pain and heard her say, "Deacon, I'm very hurting." Additionally, plaintiff's adopted son, Robert Carswell, described Jeannette after her first operation as swollen "like a frog." He opined that she appeared to be in pain, although she could not communicate.
On September 25, Jeannette was transferred to Cooper Hospital, where dialysis was available. At Cooper, too, Jeanette did not respond, but looked back strangely. Her stomach was distended. Despite further surgery, she did not improve and died on October 18, 1988.
The matter was tried before Judge Parrillo and a jury. A verdict of no cause for action was returned on January 11, 1993. On that same date, the judge granted plaintiff's motion to vacate the verdict based on jury irregularities, discussed infra.
The matter was tried a second time before Judge Little and a jury.[4] On February 16, 1995, the jury returned a verdict of no cause for action as to defendant Devlin, but returned a five-to-one verdict of liability against defendants Abraham and Cohen, attributing liability thirty-five percent and sixty-five percent respectively.[5] The jury awarded damages totalling $1,125,000, divided as follows: $325,000 for decedent's pain, suffering and medical expenses; $400,000 for plaintiff's loss of his daughter's services; and $425,000 for plaintiff's loss of Jeannette's guidance, counselling, advice and companionship. On March 17, 1995, the judge vacated the verdict on damages only and granted a new trial on damages.[6]
On September 7, 1995, the parties orally agreed on the record upon the terms of a consent judgment on damages in the amount of $550,000 while preserving their rights to appeal. When plaintiff refused to sign the documents prepared to memorialize the oral agreement, defendant successfully moved to compel the execution of those documents.[7]

I.
On appeal, defendant Abraham argues that Judge Fratto erred when he refused to dismiss plaintiff's complaint as timebarred, see N.J.S.A. 2A:14-2 (personal injury) and N.J.S.A. 2A:31-3 (wrongful death), because he was not named as a defendant until more than two years after the commission of alleged malpractice. Plaintiff responds that he timely identified Abraham through a fictitious name and could not reasonably have discovered Abraham's identity earlier.
*1374 Judge Fratto denied Abraham's pretrial motion after reviewing the hospital records and concluding that most of them were illegible.[8] The judge concluded that plaintiff first learned of Abraham's true identity on July 12, 1991, during Shinder's deposition, when Shinder identified a signature within the hospital records as being Abraham's. Plaintiff immediately filed a motion to substitute Abraham for "Bill Boe," a fictitious name utilized in the first amended complaint filed on June 18, 1990.
During the first trial, at the close of plaintiff's case, Abraham again raised this issue. Judge Parrillo also refused to dismiss Abraham on the statute of limitations ground. He explained that he was not convinced that Abraham's name or his individual culpability was easily ascertainable within two years of treatment because the name was not legible within the handwritten hospital records.
Use of a fictitious name is permitted by R. 4:26-4, which provides in part: "[I]f the defendant's true name is unknown to the plaintiff, process may issue against the defendant under a fictitious name, stating it to be fictitious and adding an appropriate description sufficient for identification." When diligent discovery discloses the party's name, amendment of the complaint may relate back and allow an action otherwise timebarred. Stegmeier v. St. Elizabeth Hosp., 239 N.J.Super. 475, 484, 571 A.2d 1006 (App. Div.1990). A plaintiff who includes a fictitious defendant "is required to proceed diligently to amend the complaint without prejudice to the defendant to be joined." Ibid.
Here, two judges separately reviewed the handwritten hospital records. Each judge concluded that the records were illegible, and that plaintiff had been unable to identify Abraham earlier. It is clear that plaintiff properly utilized a fictitious name in his first amended complaint, R. 4:26-4, and then proceeded diligently to seek leave to file a second amended complaint to substitute Abraham for that fictitious name. Plaintiff fully adhered to the rules and the dictates enunciated in Stegmeier.
Although Abraham has pointed to one instance in the hospital record where his name was fairly clear, and although his name appeared along with Cohen's name in a typewritten discharge summary, the conclusion reached by both Judge Fratto prior to the first trial, and by Judge Parrillo at the close of plaintiff's case at the first trial, finds support in the record. This is particularly so when we consider that relaxation of the fictitious-party rule is permitted in the interest of justice as when a named defendant has misled and deceived a plaintiff. See Viviano v. CBS, Inc., 101 N.J. 538, 544, 503 A.2d 296 (1986). Here, named defendants failed to specifically answer interrogatories when asked the names of all treating physicians but referred plaintiff to hospital records. Additionally, Abraham, who practiced medicine with Cohen, a named defendant, could point to no prejudice arising from late service of process. Clearly, Abraham knew that plaintiff had instituted suit against his medical associate Cohen. The doctrine of relation back is applicable particularly where there is no prejudice to the late identified defendant. Id. at 556, 503 A.2d 296.
In count four of plaintiff's fourth amended complaint he alleged that defendants failed to obtain a gynecological consult or order a CAT scan after Jeannette was hospitalized. Abraham sought to dismiss this count, both prior to the first trial and at the close of plaintiff's case at the first trial,[9] on the ground that the fourth count encompassed a new theory of liability asserted after the statute of limitations period. Again, Judge Fratto and then Judge Parrillo denied Abraham's motions. Both judges concluded that the amendments to the complaint related back to the original complaint filing date under Rule 4:9-3. We agree.
*1375 An amendment to a pleading relates back to the date of the original pleading "[w]henever the claim or defense asserted in the amended pleading arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading." R. 4:9-3. The rule accomplishes "substantial justice on the merits by permitting a technical and otherwise fatal flaw to be corrected where such correction will not materially prejudice another party." Pressler, Current N.J. Court Rules, comment 2 on R. 4:9-3 (1998). When a period of limitation has expired, only distinctly new or different claims are barred, not those pertaining to the same subject matter. Harr v. Allstate Ins. Co., 54 N.J. 287, 299-300, 255 A.2d 208 (1969). A germane claim is entitled to relation back, and it is within the discretion of the court to decide whether a new and different claim relates back. See Wimmer v. Coombs, 198 N.J.Super. 184, 188, 486 A.2d 916 (App.Div.1985). Here, both Judge Fratto and Judge Parrillo found that relation back was justified and fair. We conclude that neither judge abused his discretion in so doing.

II.
Defendants argue that the verdict in the first trial was improperly vacated because the irregular influences on the jurors lacked a tendency to influence the jury and no actual taint was shown. Plaintiff responds that the court correctly found that the verdict was tainted by the presence in the jury room of defendants' requests to charge. We agree with plaintiff.
In the first trial, Judge Parrillo learned at the lunch break on Friday, December 18, 1992, the second day of deliberations, that a folder of exhibits not intended for the jury and designated "C exhibits" had been inadvertently left in the jury deliberation room, along with other evidence, by a court officer at about 9:00 a.m. The same day, the jury announced its verdict of no cause for action at about 10:30 a.m. The "C exhibit" folder contained defendants' request to charge, which did not conform with the charge as actually given by the judge. That morning the jurors had listened to a re-reading of certain trial testimony, at their request, and returned to the deliberation room until announcing they had arrived at a verdict. The time that the jury had access to the "C exhibits" was thus very limited.
Judge Parrillo reconvened the jury on the following Monday to question them in the presence of counsel concerning the possible influence of the "C exhibits." Five of the six jurors reported having read the "C exhibits," though all denied having considered them in deliberations. Judge Parrillo did not disbelieve the jurors' testimony, but determined that the irregularity must be presumed to be prejudicial, and found that the record failed to overcome that presumption.
The judge found that portions of the proposed charges which stated the law in terms favorable to defendants had the clear capacity to undermine the court's instructions or, at least, to confuse the jurors. Moreover, the "C exhibits" were misleadingly designated as evidence. Judge Parrillo granted plaintiff's new trial motion on the ground that the "C exhibits" in the jury room had the capacity to influence the verdict.
The test for determining whether irregular influences on jurors merit a new trial is whether they "could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge." Panko v. Flintkote Co., 7 N.J. 55, 61, 80 A.2d 302 (1951). The capacity to influence is sufficient, and evidence of actual influence is not needed. Ibid. The stringency of this longstanding rule is required by the critical role of the jury. State v. Grant, 254 N.J.Super. 571, 583, 604 A.2d 147 (App.Div.1992). A jury verdict must be "entirely free from the taint of extraneous considerations and influences." Panko v. Flintkote Co., supra, 7 N.J. at 61, 80 A.2d 302.
"A motion to set aside a verdict for alleged interference with jurors is addressed to the sound legal discretion of the court and in the absence of a showing of prejudice should not be granted." Jardine Estates, Inc. v. Donna Brook Corp., 42 N.J.Super. 332, 340, 126 A.2d 372 (App.Div. 1956). However, reversal is required by either *1376 an affirmative showing of prejudice or the failure to overcome the presumption of prejudice introduced by an improper jury communication. Ibid.
In Tirrell v. Navistar Int'l, Inc., 248 N.J.Super. 390, 591 A.2d 643, (App.Div.), certif. denied, 126 N.J. 390, 599 A.2d 166 (1991), a product liability case, we rejected a claim of jury taint based on the presence in the jury room of a Newsweek magazine containing an article concerning product liability. Id. at 404-06, 591 A.2d 643. We noted that there was no showing of actual taint. Id. at 405, 591 A.2d 643. However, as Judge Parrillo pointed out, in Tirrell there was no indication that any juror had read or even noticed the magazine. Here, five of the six jurors did at least glance at the "C exhibits." In effect, in Tirrell, we found no impropriety, and therefore no presumption of prejudice. Here, in contrast, the judge did not abuse his discretion by concluding that the voir dire of the jury failed to affirmatively show that the jurors' reading of the "C exhibits" could have had no influence on the verdict. We therefore find no error in Judge Parrillo's decision to grant a new trial, and reject defendants' contention that the verdict at the first trial must be reinstated.

III.
In plaintiff's cross-appeal, he argues that Judge Little erred when he set aside the entire jury verdict in the second trial and in failing to reinstate same on plaintiff's posttrial motion for reconsideration. In defendants' appeal, they contend that the trial judge erred when he did not set aside the jury verdict on liability pursuant to their motion for a new trial on both damages and liability.
We first address the damage verdict, and do so by focusing on three special interrogatories submitted by the judge at the second trial:
5. What amount of money, if any, do you award Jeannette Clemons' estate for any pain and suffering, disability and hospital/medical expenses experienced by Ms. Clemons from the time of negligence until her death (survivor claims)?
6. What amount of money, if any, would fairly and reasonably compensate plaintiff Reverend Julius Brown for the loss of services (cleaning, shopping, cooking, typing, answering phone, etc.) as a result of his daughter, Jeannette Clemons' death which would have been provided to him had she lived, after deducting the benefits she received such as car expenses, car insurance, housing, etc. (wrongful death claims)?
7. What amount of money, if any, would fairly and reasonably compensate plaintiff, Reverend Julius Brown, for the loss of services, guidance, counseling and for funeral expenses (wrongful death claims) as a result of his daughter, Jeannette Clemon's [sic] death.
As noted supra, the jury awarded plaintiff $325,000 for pain and suffering and medical expenses (survival action), $400,000 for loss of housekeeping and clerical services, and $425,000 for loss of counseling services and funeral expenses (wrongful death action). On the same day, Judge Little granted defendants' motion to strike the $400,000 verdict. He explained, "There was no evidence from which a jury could conclude the value of cleaning, shopping, cooking, typing, answering phones, et cetera...." A month later, in response to the plaintiff's motion for reconsideration, the judge questioned whether he should ever have allowed the question concerning such damages to be placed on the verdict sheet, when there was no evidence to support it.
Judge Little denied plaintiff's motion to reinstate the $400,000 award, and granted defendants' motions to vacate the entire damage award because the size of the award indicated that it was a "runaway verdict." He found that the two verdict questions concerning loss of services (six and seven) were duplicative, and that each verdict on the wrongful death claim tainted the survival claim for pain, suffering, and medical expenses, and concluded the entire verdict was a result of sympathy, prejudice and passion.
Although we disagree with some aspects of the judge's assessment of the evidence (discussed infra), nonetheless, we find that the judge properly concluded that the entire *1377 verdict was tainted thus necessitating a new trial as to damages.
We begin our analysis by recognizing that "[t]he principle goal of damages in personal-injury actions is to compensate fairly the injured party." Caldwell v. Haynes, 136 N.J. 422, 433, 643 A.2d 564 (1994). More precisely, the purpose of personal injury compensation is simply to replace actual loss. Ruff v. Weintraub, 105 N.J. 233, 238, 519 A.2d 1384 (1987). "A trial court should not disturb the amount of a verdict unless it constitutes a manifest injustice that shocks the judicial conscience." Carey v. Lovett, 132 N.J. 44, 66, 622 A.2d 1279 (1993). However, an excessive verdict, one unsubstantiated by evidence, but attributable to prejudice, partiality, or passion, must be vacated. Id. at 66-68, 622 A.2d 1279.

A.
Special interrogatory six asked the jury to determine reasonable compensation for the loss of Jeannette's household services and assistance with plaintiff's clerical duties.
Plaintiff testified that from the time his wife died in August 1987 until Jeannette entered the hospital in September 1988, Jeannette had lived with him and helped him by answering phone calls and letters, paying bills, driving, cooking, cleaning, shopping, and washing. Jeannette lived at the parsonage expense-free; plaintiff and her brother John paid her car and clothing expenses. According to plaintiff, the decedent remained with him not only to help, but "because she didn't know where her husband was, and she was better off with me."
The surviving next of kin is entitled to damages for "pecuniary injuries" resulting from wrongful death. See N.J.S.A. 2A:31-5. This injury consists of deprivation of a reasonable expectation of pecuniary advantage. Green v. Bittner, 85 N.J. 1, 11, 424 A.2d 210 (1980). Expert testimony is not necessary to place a value on prospective services, but it is helpful to avoid leaving the jury to conjecture on those values. Id. at 15-17, 424 A.2d 210. Plaintiff presented no evidence of either the value of the housekeeping and clerical services, or the counterbalancing value of the decedent's living expenses. Here, it would have been feasible to present evidence of present economic value, id. at 17, 424 A.2d 210, of the kinds of services Jeannette provided. Damages replace services that could otherwise be bought, and that the decedent would have likely provided had she lived. Hudgins v. Serrano, 186 N.J.Super. 465, 478, 453 A.2d 218 (App.Div.1982).
The jury was futilely without guidance concerning both the value of the household services the decedent had been providing and the value of the services plaintiff was providing to her. A jury is not authorized to base a decision on conjecture or speculation. See Germann v. Matriss, 55 N.J. 193, 208, 260 A.2d 825 (1970). Jurors were required to estimate the time period in which plaintiff would continue to require such clerical and household services; but that estimate could not have been long, as plaintiff was age 86 as of the date of trial.[10]
The judge expressly based his denial of plaintiff's motion to reconsider the vacation of the $400,000 damage award for loss of services on the failure to establish a reasonable value of those services. We agree with that determination.

B.
Special interrogatory seven focused upon reasonable compensation to plaintiff for the loss of services, guidance, and counselling resulting from Jeannette's death and the funeral expenses incurred in her burial. The jury awarded plaintiff $425,000. The trial judge vacated that award on defendants' post-trial motion, concluding that: (1) there had been insufficient evidence to supports such a valuation; (2) question number seven was duplicative of question six; and (3) the *1378 verdict was a result of sympathy, passion, and prejudice. We agree with the judge's determination.
Although there was evidence presented that Jeannette was a supportive companion to plaintiff after his wife's death, plaintiff offered no evidence to equate Jeannette's companionship to the cost of providing similar companionship, counsel or guidance from a paid helper. Although Green v. Bittner, supra, instructs that expert testimony is not necessary to place a value on prospective services of a minor child, it is clear that the Supreme Court cautioned that expert testimony is helpful to avoid leaving the jury to conjecture on valuation. 85 N.J. at 15-17, 424 A.2d 210. See also Lesniak v. County of Bergen, 117 N.J. 12, 28-29, 563 A.2d 795 (1989) (holding that for injured infants, evidence to permit specific quantification of a loss or diminution of future earnings is not required, as such evidence is inevitably limited or non-existent). Here, we are valuing the services of an adult. Quantification was feasible through expert testimony. The jury should not have been left to conjecture on this matter.
It is also clear from Green v. Bittner, supra, that the loss of a child's companionship and guidance, whether the child be an infant or an adult child, is not a separate claim from the loss of a child's services. 85 N.J. at 7-8, 424 A.2d 210. It was error to separate the claim into two separate jury interrogatories.
Lastly, the judge concluded the verdict was governed by sympathy, passion and prejudice. Although the judge did not fully and explicitly articulate his reasons, he characterized the verdict as a "runaway verdict." It is clear from the colloquy with counsel at the post-trial motions that the judge concluded the verdict on question seven was so disproportionate to the loss sustained so as to shock his conscience. See Taweel v. Starn's Shoprite Supermarket, 58 N.J. 227, 236, 276 A.2d 861 (1971). We conclude that the judge properly vacated the wrongful death award.

C.
The parties agree that the $325,000 award for pain and suffering included $25,000 for medical bills. The remaining $300,000 represented the portion of the decedent's pain and suffering between September 15, 1988, when she came under the care of defendants and October 18, 1988.
The trial judge noted, "[M]y first inclination was not to touch the pain and suffering, was to let it stay because it's there. But when you go back to the other two verdicts of 400,000 and 425,000 [sic], they're definitely runaway verdicts." The judge concluded that the excessiveness of the wrongful death awards rendered suspect the entire damage verdict. We agree. See Caldwell v. Haynes, supra, 136 N.J. at 441-42, 643 A.2d 564 (holding that the excessiveness of lost wage awards undermined the reliability of a separate award for pain and suffering).

IV.
As part of his cross-appeal, plaintiff urges that his counsel was improperly compelled to sign the consent judgment which resolved the litigation subject to a reservation permitting each party the right to pursue this appeal. Plaintiff's primary objection arose from the failure to include in the consent judgment recovery provisions consistent with the Comparative Negligence Act, N.J.S.A. 2A:15-5.1 to -5.4. Defendants contend that the terms of the consent judgment accurately reflect the terms of the agreement placed on the record after the settlement was negotiated. We agree with defendants' contention.
The consent judgment as negotiated provided that plaintiff would recover a total judgment of $550,000 predicated upon an award of $50,000 attributable to the survival action, and $500,000 attributable to the wrongful death action. Additionally, the parties agreed that the judgment would allocate liability as per the jury verdict: sixty-five percent attributable to Cohen; and thirtyfive percent attributable to Abraham. When memorialized, the consent judgment provided that judgment be entered in the two actions against Cohen for $32,500 and $325,000, and against Abraham for $17,500 and $175,000.
Since the form of judgment accurately reflected the stipulations of counsel, *1379 which had been placed on the record before Judge Drozdowski, the judge compelled plaintiff's counsel to execute the judgment as prepared, which omitted any reference to the Comparative Negligence Act. We agree with Judge Drozdowski's determination. Plaintiff's counsel failed to mention the Comparative Negligence Act when the proposed judgment terms were placed on the record. The parties simply agreed to maintain the proportional responsibility determined by the jury in the second trial under N.J.S.A. 2A:15-5.2. Thus, there was no basis to modify the settlement terms and plaintiff's contentions in his cross-appeal are rejected. The oral agreement was reflected in the form of judgment and was properly enforced.
Affirmed.
NOTES
[1] The record on appeal offers an alternative spelling of the decedent's nameJeanette.
[2] Plaintiff's complaint, as twice amended pursuant to court orders, ultimately named as defendants the Kennedy Memorial Hospital-University Medical Center (Cherry Hill Division) (JFK), Dr. Thomas Devlin (Devlin), and Dr. Arnold Shinder (Shinder). Some of these defendants were initially named as fictitious defendants, thus necessitating the amended complaints to reflect the actual names of the defendants once those names were learned during pre-trial discovery.

On May 22, 1992, defendant Abraham named for the first time in plaintiff's first amended complaint, filed a motion for summary judgment based on the statute of limitations. That motion was denied predicated upon the theory of relation back. See R. 4:9-3. Plaintiff's complaint as to JFK was dismissed prior to the first trial.
[3] Jeannette's brother, John Brown, and his wife also resided in the parsonage. Testimony at trial indicated that John Brown also assisted in caring for plaintiff.
[4] The complaint against defendant Shinder was dismissed on the first day of this trial.
[5] "Abraham & Cohen" was not treated as a separate entity.
[6] We need not review the precise medical testimony offered at the second trial. Suffice to say, plaintiff presented an expert witness, Dr. Richard Bassin, who opined that within a reasonable degree of medical probability, Abraham and Cohen deviated from accepted medical care in their treatment of Jeannette prior to her surgery on September 18, 1988, and post-surgery in failing to order additional tests which would have revealed the need for further surgery to remove pus from the abdominal cavity resulting from a perforated appendix which was discovered on September 18, 1988, during the initial surgery.

Each defendant offered expert testimony and each defendant testified. Both experts opined that neither defendant deviated from the accepted standards of medical practice.
[7] Thereafter, each defendant filed a separate notice of appeal, and plaintiff filed a cross-appeal in each appeal. Both appeals were ultimately consolidated by this court.
[8] The stenographic notes of the June 26, 1992, motion proceedings were lost. On February 27, 1997, Judge Fratto filed a statement of facts, reconstructing the record of the 1992 hearing. As noted by Judge Fratto, prior to Shinder's deposition, all other defendants' answers to interrogatories, when asked to identify the names of all treating physicians, referred plaintiff to the hospital records.
[9] Cohen joined Abraham's motion to dismiss at the close of plaintiff's direct case in the first trial.
[10] The trial judge instructed the jury that the actuarial tables approved by the court end at age eighty-five, when a person's life expectancy is 6.7 years. Additionally, there was testimony that plaintiff had had a sextuple heart bypass and gallbladder surgery subsequent to Jeannette's death.