NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1049-16T1

MARY C. DUTTON, as
Administratrix Ad Prosequendum
of the ESTATE OF PATRICK E.
DUTTON,

       Plaintiff-Respondent,

v.

STEPHEN V. RANDO,

       Defendant-Appellant.

_____

> **APPROVED FOR PUBLICATION**
>
> **February 26, 2019**
>
> **APPELLATE DIVISION**

Argued December 4, 2018 – Decided February 26, 2019

Before Judges Sabatino, Haas and Mitterhoff.

On appeal from Superior Court of New Jersey, Law Division, Atlantic County, Docket No. L-6051-13.

Robert M. Kaplan argued the cause for appellant (Margolis Edelstein, attorneys; Robert M. Kaplan, of counsel and on the brief).

Michael A. Gibson argued the cause for respondent (D'Arcy Johnson Day, attorneys; Michael A. Gibson, on the brief).

The opinion of the court was delivered by

MITTERHOFF, J.S.C. (temporarily assigned).

This appeal arises from a tragic highway collision in which defendant Stephen Rando's sports utility vehicle ("SUV") fatally struck plaintiff's son, Patrick Dutton, as he was riding his bicycle. Following a trial, the jury found that defendant was sixty percent responsible for the accident while Patrick[1] was responsible for the remaining forty percent. The jury awarded plaintiff Mary Dutton, representing her son's estate, $500,000 in wrongful death damages and $108,000 in survivorship damages. The trial court entered judgment in the sum of $364,800 in damages and additional interest, fees, and costs.

Defendant appeals from the judgment memorializing the verdict and from the trial court's order denying his motion for a new trial. Among other things, defendant contends that the jury's award of wrongful death damages is unsupported by the evidence, particularly without any expert testimony to substantiate the pecuniary value of the loss of Patrick's advice, guidance, and companionship. We reject defendant's contention and reaffirm the long-standing principle, as expressed in Lesniak v. County of Bergen, 117 N.J. 12, 32-33 (1989), that expert testimony is not required to establish the pecuniary

---

[1] Because the decedent and multiple witnesses share the same last names, we will refer to them by their first names. We intend no disrespect.

value of such services in claims for wrongful death.  For the reasons that follow, we affirm.

I.

On October 2, 2013, plaintiff filed a civil action under the New Jersey Survivor's Act, N.J.S.A. 2A:15-3, and the New Jersey Wrongful Death Act, N.J.S.A. 2A:31-1 to -6, alleging that defendant's negligent operation of his motor vehicle caused Patrick's death.

On August 15, 2016, defendant filed a pretrial motion in limine, arguing that plaintiff's wrongful death claim was barred because plaintiff was not planning to introduce any evidence substantiating the replacement cost of Patrick's advice, guidance, and companionship.  The trial court denied the motion, finding it premature to decide whether plaintiff had presented a factual basis for damages.

A jury trial took place between August 16 and August 24, 2016.  We recite the relevant facts from the testimony and evidence presented at trial.

<u>Liability-Related Proofs</u>

On the evening of February 26, 2012 defendant, an off-duty Atlantic City police officer, was driving his SUV in the left lane on the eastbound side of Black Horse Pike in Egg Harbor Township, with his wife, Jennifer Rando, sitting

3

in the passenger seat. Black Horse Pike is a four-lane highway with two eastbound and two westbound lines that are divided by a concrete, grassy median. A two-foot space separates the median from the fog line of the left lane on the eastbound side of the road. The posted speed limit is fifty miles per hour. It was dark that night, ambient lighting was minimal, and the roads were damp and filled with puddles from an earlier thunderstorm.

Indisputably, the Rando's SUV struck Patrick that night while the decedent was on his bicycle at or near an intersection between Black Horse Pike and Tower Avenue, where there is a forty-six-foot gap between the concrete medians dividing the highway. The impact sent Patrick several feet in the air until he came to rest on the westbound portion of Black Horse Pike where he bled to death on the road. Patrick was nineteen years old at the time of the accident. At trial, the nature of the collision and how it occurred was heavily disputed.

When Officer Kevin Devlin, of the Egg Harbor Township Police Department, responded to investigate the collision that night, he observed Patrick laying on the westbound side of the road with the remains of the bicycle and other debris scattered throughout the left lane of the eastbound road. Officer Devlin concluded that defendant's SUV hit the bicycle while Patrick was

traveling in a westerly direction in the left-hand travel lane of Black Horse Pike eastbound. In Devlin's view, the evidence did not support that the SUV had swerved prior to the collision. Based on the scuff marks on the road, Devlin determined the impact projected Patrick in a northeasterly direction until his body came to rest on the westbound side of the road.

Plaintiff's expert, Dr. Steven Batterman, testified that the physical evidence did not support Officer Devlin's conclusion that a head-on collision occurred in the left lane of the eastbound road. Instead, he believed that the vehicles were perpendicular at the point of impact and that the collision occurred in the center of the intersection in the gap between the concrete medians. Batterman noted the projectile direction of debris from the collision was northeast and that the damage to the SUV was primarily relegated to the front left wheel, headlights, and fender. The lack of damage to the windshield of the SUV, in Batterman's opinion, also weighed against the possibility that the front of the vehicle hit Patrick head-on. Based on the braking distance of the SUV and the amount of damage caused, Batterman believed defendant was traveling between sixty and sixty-five miles per hour prior to impact in an area where the speed limit was fifty. Batterman concluded that defendant was inattentive,

failed to observe Patrick, and that "for reasons unknown" the SUV swerved to the left, hitting both Patrick and the bicycle.

William Meyer, the defense's accident reconstruction expert, disagreed with Batterman about the point of impact, believing, as Officer Devlin did, that the collision occurred in the left lane of Black Horse Pike eastbound. Because the damage to the bicycle was localized to the front section, Meyer disagreed with Batterman that the vehicles were perpendicular at the point of impact and concluded that Patrick had entered defendant's lane, traveling at a southwest angle. In Meyer's opinion, defendant did not have enough time to observe and react to Patrick to avoid the collision.

Defendant testified that he never saw Patrick before he heard and felt the impact of the collision. Jennifer Rando testified that she did see Patrick but only in the moment immediately prior to impact when she had turned to speak to her husband. She attempted to yell to alert him, but it was too late to avoid impact.

Apart from the Randos, the only testifying witness who directly observed the collision was Gary Maisano, who stated that he was driving on the eastbound side of Black Horse Pike and drove past Patrick as the latter stood on the median, "straddling" his bicycle with his feet on the ground, stationary. Maisano testified that Patrick was perpendicular to Maisano's vehicle, facing south.

6

Immediately after passing Patrick, from his left side view mirror, Maisano observed Patrick's silhouette cross in front of a car just before a loud impact.

April Roadside, with her passenger, Tamara Baum, was driving in the right lane of the eastbound side of the road behind defendant's SUV prior to the crash. Roadside and Baum both testified that the SUV suddenly swerved left and, immediately afterwards, sparks and debris flew towards them, forcing Roadside to maneuver their car to avoid being hit.

Karen Carboni saw Patrick traveling on Black Horse Pike prior to the accident. Carboni testified that she was driving in the right lane of the eastbound side of the highway when part of Patrick's bicycle came into her lane of travel, causing her to quickly veer left to avoid striking him. Carboni did not see Patrick until she was a car length and a half behind him. Patrick had been dressed in dark clothing and had no visible reflectors on his bicycle, leading Carboni to comment to her daughter seated next to her that Patrick's manner of travel was "very dangerous." Carboni did not see or hear the collision.

Damages-Related Proofs

Plaintiff presented testimony regarding her relationship with Patrick. Patrick's aunt Irene testified that Patrick had been living with her in the year prior to his death, while plaintiff was living in a homeless shelter. Patrick's

older brother Brandon testified that Patrick and he had been putting aside money every week to buy plaintiff a house or apartment and that Patrick had been saving between twenty and fifty dollars per paycheck to that end.  Irene mostly corroborated Brandon's account, though she recalled that Patrick had been saving between fifty and seventy-five dollars per week and that he had intended to buy a car before purchasing a family home.  Irene also recounted that Patrick was outgoing, helpful, and a hard worker with a good reputation at his two jobs.

Plaintiff testified that the companionship Patrick provided her was "definitely one of the important things" in her life.  Plaintiff and Patrick had been speaking over the phone on a nightly basis and saw each other once or twice per week to have meals together, go to the park, or walk the boardwalk, among other activities.  Patrick had comforted plaintiff with his words, sense of humor, and displays of affection.  Plaintiff attested that these interactions with her late son had given her "a whole different outlook on life" and that Patrick "lifted [her] up even when the clouds were real grey."

Plaintiff also testified that she probably would not have accepted money from either of her sons, because, as their mother, she felt it her duty to help them rather than accept help from them.  Though her family offered for plaintiff to

8

stay with them, plaintiff refused, because, in her words, she was "stubborn" and "didn't want to burden" them.

At the close of plaintiff's case-in-chief, defendant moved for involuntary dismissal of the wrongful death claim, renewing the argument that plaintiff had not provided any evidence of the pecuniary value of the services Patrick provided plaintiff and that no reasonable juror could find that plaintiff had established proof of damages. The court denied the motion.

The Jury Charge, Verdict, and New Trial Motion

In the final charge to the jury before deliberation, the trial judge read the model jury charge on wrongful death without objection from either party. Among other things, the model charge directs juries: not to consider either emotional distress plaintiff may have suffered as a result of the decedent's death or emotional satisfaction plaintiff may have derived from the decedent's companionship; to limit the damages to plaintiff's financial loss from the death, including the value of companionship services that Patrick would have provided to plaintiff for the remaining years of her life, had he survived; to estimate the reasonable value of the companionship services provided by determining the value of substantially similar services provided "by paid companions or homemakers who are often hired by the aged or infirm or . . . by nurses or

A-1049-16T1

practical nurses" and to consider that "future losses cannot go beyond the point when it is expected that [plaintiff] will survive." See Model Jury Charge (Civil), 8.43, "Wrongful Death" (March 2010). In accordance with the model charge, the court advised the jury that plaintiff's anticipated life expectancy was 29.4 years.

On the second day of deliberations, the jury asked the court for an "explanation/clarification of question number 7," which was the question on the verdict sheet pertaining to wrongful death damages. With no party objecting, the trial judge once again issued the wrongful death model charge.

On the same afternoon, the jury reached its verdict, finding that defendant and Patrick were both negligent and that each proximately caused the collision, with sixty percent of the liability residing with defendant and forty percent with Patrick. The jury awarded plaintiff a gross sum of $108,000 for Patrick's conscious pain and suffering on the Survivor's Act claim and a gross sum of $500,000 for the pecuniary loss of Patrick's advice, counsel, and companionship on the Wrongful Death Act claim. The court molded the awards to the sum of $364,800 to reflect decedent's comparative fault.

Defendant moved for a new trial, which the trial court denied on September 30, 2016. On the same day, the court entered an order for judgment,

finding defendant liable to plaintiff in the molded sum of $364,800 in damages. Having found that the jury verdict was more than 120% of the claimant's offer of judgment, pursuant to Rule 4:58-2, the court awarded an additional $31,207.89 in accrued interest, $80,162.50 in attorney fees, and $20,331.06 in litigation costs, resulting in a total award and final judgment of $496,501.45.

This appeal followed. On appeal, defendant raises the following points for our review:

I. The evidence clearly established that the defendant was not at fault for the happening of plaintiff's decedent's accident – much less a finding that defendant's fault was greater than that of plaintiff's decedent – therefore the only explanation for the jury's verdict is sympathy, bias, pity and passion and the trial court erred in not vacating the jury's liability verdict.

II. As plaintiff failed to present her wrongful death claim in a manner which would permit the jury to fashion an award for the pecuniary value of plaintiff's loss of advice, counsel and companionship without speculating, the trial court erred in permitting the issue to go to the jury and erred in failing to vacate the jury's ultimate award of damages.

Plaintiff has not cross-appealed on any issues.

## II.

## A.

Turning to defendant's first point, we find that the trial court did not err in denying defendant's motion for a new trial on liability. "The standard of review on appeal from decisions on motions for a new trial is the same as that governing the trial judge—whether there was a miscarriage of justice under the law." Risko v. Thompson Muller Auto. Grp., 206 N.J. 506, 522 (2011); see also R. 4:49-1(a) ("The trial judge shall grant the motion [for a new trial] if, having due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law.").

In this regard, "[a] jury verdict is entitled to considerable deference[.]" Risko, 206 N.J. at 521. "On a motion for a new trial, all evidence supporting the verdict must be accepted as true, and all reasonable inferences must be drawn in favor of upholding the verdict." Boryszewski ex rel. Boryszewski v. Burke, 380 N.J. Super. 361, 391 (App. Div. 2005). "[A] trial court should not interfere with a jury verdict unless the verdict is clearly against the weight of the evidence." Caldwell v. Haynes, 136 N.J. 422, 432 (1994). To overturn a jury verdict, "[t]he verdict must shock the judicial conscience." Ibid.

A-1049-16T1

Applying this deferential standard of review, we find that the jury's liability verdict neither shocks the judicial conscience nor amounts to a miscarriage of justice. In denying the motion for a new trial, the trial court held that the jury's verdict regarding defendant's apportioned liability was "not clearly and convincingly contrary to the weight of the evidence." The court reasoned:

> Witnesses testified as to the decedent's visibility and location, as well Defendant's actions, such that the jury's finding of Defendant's 60% liability for the accident would not be clearly and convincingly contrary to the weight of the evidence. Specifically, other vehicle operators and Defendant's passenger visibly saw decedent prior to the collision, one witness testified that the decedent was on the median prior to the collision and not in Defendant's lane of traffic, and a further witness testified to seeing Defendant's vehicle swerve toward the median prior to the collision. In light of such facts, it would not be unreasonable for a factfinder to find liability as the jury in this case did, and thus this argument fails.

Having reviewed the record, we conclude that the trial judge's findings and reasoning are amply supported by the record. We therefore affirm the trial court's order denying defendant's motion for a new trial on liability.

B.

We next address defendant's argument that the jury's award of wrongful death damages is unsupported by any evidence that would permit the jury to

13

fashion an award for the pecuniary value of plaintiff's loss of advice, counsel and companionship. Specifically, defendant contends the trial court erred in denying his motion for an involuntary dismissal of plaintiff's wrongful death claim at the close of plaintiff's case-in-chief and in refusing to vacate the jury's verdict awarding a gross sum of $500,000 in wrongful death damages. Defendant argues that either expert or other specific testimony was required as a matter of law to substantiate the economic value of Patrick's lost companionship. In the absence of this evidence, defendant claims, the verdict could only have been premised on "pure speculation coupled with sympathy, passion and prejudice."

In addressing defendant's arguments, we first consider the background of New Jersey's Wrongful Death Act. When a defendant is found liable under the Wrongful Death Act for negligently causing a person's death, the jury may award "such damages as they shall deem fair and just with reference to the pecuniary injuries resulting from such death, together with the hospital, medical and funeral expenses incurred for the deceased, to the persons entitled to any intestate personal property of the decedent." N.J.S.A. 2A:31-5.

As no civil remedy for wrongful death existed under the common law, see generally Jacob A. Stein, Stein on Personal Injury Damages, § 3.1 (3d. ed. 2018)

A-1049-16T1

(discussing history of common law rule and origin of wrongful death statutes), the nation's wrongful death statutes derived from an 1846 act of the British Parliament known as "Lord Campbell's Act," pursuant to which "[l]oss meant only money loss, and money loss from the death of a child meant only his lost wages. All else was imaginary. The only reality was the King's shilling." Wycko v. Gnodtke, 105 N.W.2d 118, 121 (Mich. 1960). American wrongful death statutes borrowed this economic component from Lord Campbell's Act in what became known as the "pecuniary loss rule." Stein, § 3.6; see also Beim v. Hulfish, 216 N.J. 484, 499 (2014) ("[In 1848], the New Jersey Legislature enacted its first wrongful death statute, substantially modeled after Lord Campbell's Act.").

The common law did provide a cause of action for "loss of consortium," Ekalo v. Constructive Serv. Corp. of America, 46 N.J. 82, 85 (1965), a term "encompassing the services of the wife, the financial support of the husband, and the variety of intangible relations which exist between spouses living together in marriage." Hopson v. St. Mary's Hosp., 408 A.2d 260, 261 (Conn. 1979). In recent years, several states have expanded the definition of "consortium" to apply to other familial or intimate relationships in the wrongful death context. See, e.g., Hoesing v. Sears, Roebuck & Co., 484 F. Supp. 478,

15

480 (D. Neb. 1980) ("[T]he parents, children, and siblings of a deceased person may bring a wrongful death action to recover for the loss of consortium due to their relative's death."); Williams v. Hook, 804 P.2d 1131, 1138 (Okla. 1990) (recognizing a child's right to bring an action for the loss of "parental consortium"); Hancock v. Chattanooga-Hamilton Cty. Hosp. Auth., 54 S.W.3d 234, 236 (Tenn. 2001) (allowing the parent of a decedent to recover for loss of "filial consortium").

Originally, in New Jersey, the pecuniary loss rule prevented recovery in wrongful death actions for what the Supreme Court called "the non-pecuniary loss of the society and companionship" of the deceased, which the Court analogized to loss of consortium. Russell v. Salem Transp. Co., 61 N.J. 502, 508 (1972). In Green v. Bittner, however, the Court "isolate[d] from the ordinary 'loss of society and companionship' those elements having a distinctly pecuniary value." 85 N.J. 1, 18 (1980). After Green, plaintiffs could recover the lost value of the decedent's "companionship and advice . . . limited strictly to [the] pecuniary element" of such services, as determined by "what the marketplace would pay a stranger with similar qualifications for performing such services." Id. at 12. Nevertheless, it affirmed that our wrongful death statute is "too clear to allow compensation, directly or indirectly, for emotional

loss." Ibid.; see also Beim, 216 N.J. at 502 ("Even when wrongful death damages are premised upon non-monetary losses, they are measured by the monetary value of the contributions that the decedent would have made to his survivors during his or her life had that life not been cut short.").

Based on our research, it appears fourteen of our sister states similarly strictly apply the pecuniary loss rule to preclude recovery for emotional damages in wrongful death actions, but allow recovery for the pecuniary component of

lost advice, counsel, or companionship of the decedent through either case law or statute.[2] [3]

---

[2] See Mass. Gen. Laws Ann. ch. 229, § 2; N.C. Gen. Stat. § 28A-18-2(b); Heimlicher v. Steele, 615 F. Supp. 2d 884, 924 (N.D. Iowa 2009); Keller v. Feasterville Family Health Care Ctr., 557 F. Supp. 2d 671, 687 (E.D. Pa. 2008); Canavin v. Pac. Sw. Airlines, 196 Cal. Rptr. 82, 86 (Cal. App. 1983); Campos v. Coleman, 123 A.3d 854, 868 (Conn. 2015); Carroll Fulmer Logistics Corp. v. Hines, 710 S.E.2d 888, 890 (Ga. Ct. App. 2011); Youngquist v. W. Nat'l Mut. Ins. Co., 716 N.W.2d 383, 386 (Minn. Ct. App. 2006); Reiser v. Coburn, 587 N.W.2d 336, 340 (Neb. 1998); Gonzalez v. N.Y.C. Hous. Auth., 572 N.E.2d 598, 600-01 (N.Y. 1991); Flagtwet v. Smith, 367 N.W.2d 188, 190-91 (S.D. 1985); Thurmon v. Sellers, 62 S.W.3d 145, 161 (Tenn. Ct. App. 2001); Bowers v. Fibreboard Corp., 832 P.2d 523, 526 (Wash. Ct. App. 1992); Knowles v. Corkill, 51 P.3d 859, 863-65 (Wyo. 2002). Unlike most states, Connecticut and Georgia require wrongful death damages to be evaluated from the point of view of the decedent, not of the plaintiff. See Procaccini v. Lawrence & Mem'l Hosp., Inc., 168 A.3d 538, 563 (Conn. App. Ct. 2017) (describing factors to consider "[r]egarding compensation for the destruction of a decedent's capacity to carry on and enjoy life's activities"); Carroll, 710 S.E.2d at 890 ("Since these damages are measured from the decedent's point of view, there is no recovery for damages, including mental or emotional suffering, experienced by the decedent's survivors as a result of the wrongful death.").

[3] These fifteen states, including New Jersey, that restrict recovery for non-pecuniary loss in wrongful death actions represent the minority legislative approach. Thirty-four states have expanded recovery in wrongful death cases beyond the pecuniary loss rule to allow recovery for non-pecuniary injury, including in many states for emotional loss, mental anguish, grief, or sorrow of the plaintiff. See Alaska Stat. § 09.17.010(a); Ark. Code Ann. § 16-62-102(f); Colo. Rev. Stat. §§ 13-21-102.5(2)(b), 13-21-203(1)(a); Del. Code Ann. tit. 10, § 3724(d)(5); Fla. Stat. § 768.21(4); Idaho Code §§ 6-1601(5), 1603(1); 740 Ill. Comp. Stat. Ann. 180/2(a); Kan. Stat. Ann. §§ 60-1903, 60-1904(a); Me. Stat. tit. 18-A, § 2-804; Md. Code Ann., Cts & Jud. Proc. § 3-904(d); Mich. Comp. Laws §§ 600.1483, 600.2922(6); Nev. Rev. Stat. Ann. § 41.085(4); N.H. Rev.

A-1049-16T1

Under New Jersey law, in cases involving the death of a child, plaintiffs may recover for "the pecuniary value of the child's companionship, including his or her advice and guidance, as the parents grow older." Carey v. Lovett, 132 N.J. 44, 67 (1993). With respect to companionship, "the jury's focus is on the existence of [the parent-child] relationship and the value of the advice, guidance and counsel that inhere in it." Johnson v. Dobrosky, 187 N.J. 594, 610 (2006). "Given a normal parent-child relationship, a jury could very well find it is sufficiently probable, had the child lived, that at some point he or she would

Stat. Ann. § 556.12; Ohio Rev. Code Ann. § 2125.02(B)(5); Okla. Stat. tit. 12, § 1053(B); Or. Rev. Stat. Ann. § 30.020(d); Va. Code Ann. § 8.01-52(1); W. Va. Code § 55-7-6(c); Wis. Stat. Ann. § 895.04(4); Gast v. Kwak, 396 F. Supp. 2d 1150, 1154 (D. Haw. 2005); Walsh v. Advanced Cardiac Specialists Chartered, 273 P.3d 645, 648 (Ariz. 2012); Ed Wiersma Trucking Co. v. Pfaff, 643 N.E.2d 909, 911 (Ind. Ct. App. 1994); Giuliani v. Guiler, 951 S.W.2d 318, 320 (Ky. 1997); Bryant v. Solomon, 712 So. 2d 145, 147 (La. 1998); Coho Res., Inc. v. McCarthy, 829 So. 2d 1, 24 (Miss. 2002); Mansfield v. Horner, 443 S.W.3d 627, 641-42 (Mo. Ct. App. 2014); Hern v. Safeco Ins. Co., 125 P.3d 597, 608-09 (Mont. 2005); Romero v. Byers, 872 P.2d 840, 844 (N.M. 1994); Hopkins v. McBane, 427 N.W.2d 85, 94 (N.D. 1988); Sindelar v. Leguia, 750 A.2d 967, 971-72 (R.I. 2000); Knoke v. S.C. Dep't of Park, Recreation & Tourism, 478 S.E.2d 256, 258-59 (S.C. 2015); Sanchez v. Schindler, 651 S.W.2d 249, 251 (Tex. 1983); Jones v. Carvell, 641 P.2d 105, 107 (Utah 1982); Hartnett v. Union Mut. Fire Ins. Co., 569 A.2d 486, 488 (Vt. 1989). Alabama is the only state in which plaintiffs may not recover compensatory damages in wrongful death cases, though they may recover discretionary punitive damages linked to the wrongfulness of the tortfeasor's conduct, and not to the plaintiff's or decedent's losses. See Roe v. Michelin N. Am., Inc., 637 F. Supp. 2d 995, 999 (M.D. Ala. 2009) ("Alabama is the only State that allows only discretionary punitive damages in wrongful-death cases.").

19

have rendered . . . companionship services . . . and advice, guidance and counsel[.]"  Green, 85 N.J. at 16.

Once the parent-child relationship is established, juries should employ "an objective standard for calculating the value of advice, guidance and counsel . . . confined to what 'the marketplace would pay' for lost household services or the services of a business adviser, therapist or trained counselor."  Johnson, 187 N.J. at 610 (quoting Green, 85 N.J. at 12).  "[W]hile pecuniary losses under N.J.S.A. 2A:31-5 cannot be premised on speculation, an exact calculation of the plaintiff's damages may not be feasible in every case."  Beim, 216 N.J. at 504.

Even though the assessment of pecuniary losses from a decedent's death may be "burdened with the element of speculation," the Supreme Court has instructed that determination of such questions are "not so beyond the common knowledge and common experience of jurors as to warrant . . . making expert testimony mandatory in such cases."  Lesniak, 117 N.J. at 32-33; see also Brown v. Kennedy Mem'l Hosp., 312 N.J. Super. 579, 593-94 (App. Div. 1998) ("Expert testimony is not necessary to place a value on prospective services, but it is helpful to avoid leaving the jury to conjecture on those values." (emphasis added)).

Likewise, in the fourteen states with wrongful death statutes similar to the New Jersey Wrongful Death Act, courts have upheld wrongful death damages in the absence of expert testimony. See, e.g., Mendoza v. City of W. Convina, 141 Cal. Rptr. 3d 553, 569 (Cal. Ct. App. 2012) (setting forth basis for sustaining wrongful death damages verdict without referencing expert testimony); Consol. Freightways Corp. v. Futrell, 410 S.E.2d 751, 753 (Ga. Ct. App. 1991) (upholding verdict for the loss of the "intangible aspects of the decedents' lives" based on "scant" testimony from family members, but not from experts); Evans v. FirstFleet, Inc., 345 S.W.3d 297, 304-07 (Mo. Ct. App. 2011) (sustaining wrongful death damages based on lay testimony without reciting any expert testimony); Walsh v. Morris, 511 N.Y.S. 2d 428, 430 (N.Y. App. Div. 1987) (upholding $50,000 wrongful death award despite the fact that the decedent had no "earning capacity" and "there was no expert testimony as to the value of her services as a homemaker"); Williams v. Monarch Transp., Inc., 470 N.W.2d 751, 756-57 (Neb. 1991) (upholding damages verdict based on "the history of an extraordinary young woman's very remarkable relationship with her parents"); Knowles v. State, 49 S.W.3d 330, 340-41 (Tenn. Ct. App. 2001) (upholding verdict without mentioning expert testimony where decedent's children had testified about their relationship with their father). Indeed, our research has not

21

revealed any case in these jurisdictions that has required expert testimony to establish the pecuniary value of the decedent's advice, guidance, and counsel.

With this background in mind, we turn to defendant's contention that the trial court erred in denying his motion for involuntary dismissal of plaintiff's wrongful death claim. We apply the same standard as the trial court in assessing whether a motion for involuntary dismissal should have been granted. Hitesman v. Bridgeway, Inc., 218 N.J. 8, 26 (2014). Under that standard, "[a] motion for involuntary dismissal only should be granted where no rational juror could conclude that the plaintiff marshaled sufficient evidence to satisfy each prima facie element of a cause of action." Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 197 (2008); see also R. 4:37-2(b) (providing that a defendant "may move for a dismissal of the action or of any claim on the ground that upon the facts and upon the law the plaintiff has shown no right to relief[,]" but that "such motion shall be denied if the evidence, together with the legitimate inferences therefrom, could sustain a judgment in plaintiff's favor").

In addressing defendant's motion for involuntary dismissal of the wrongful death claim, the trial judge commented, "I do think that there are problems that the plaintiff has in proving the quantum of damages for services and things of that nature because nothing was presented in those areas[,]" but

permitted the issue to go to the jury because the "concept" was "within the ken of the jury." Although the trial court mischaracterized the record in asserting that plaintiff had offered "nothing" to support wrongful death damages, we agree that plaintiff's wrongful death damages claim was properly submitted to the jury.

Plaintiff introduced testimony showing that Patrick's death caused the "most common class of pecuniary injury[,] . . . the loss of future financial contributions[,]" to plaintiff. Johnson, 187 N.J. at 607. Specifically, Patrick had been working two jobs prior to his death and was saving money with the specific intention to purchase an apartment or house for his mother and possibly other family members. Notwithstanding plaintiff's comments that she would probably not have accepted any financial contributions from Patrick, the jury could still have reasonably inferred that Patrick would have made such contributions and that plaintiff was likely to have accepted them.

There was also ample testimony regarding the companionship services Patrick offered to plaintiff. Brandon, Irene, and plaintiff herself testified that plaintiff's relationship with Patrick was "definitely one of the important things" in her life. Patrick comforted plaintiff with his sense of humor and his displays of affection, and gave plaintiff "a whole different outlook on life" with his words. The two spoke on a nightly basis and saw each other weekly. Brandon

23

testified that plaintiff was more likely to seek advice from Patrick than himself, because Patrick was better at making plaintiff feel better.

Viewing, as we must, the evidence in the light most favorable to plaintiff, we find there was sufficient credible evidence upon which a rational juror could conclude that plaintiff had established pecuniary injury. We therefore affirm the trial court's denial of defendant's motion for the involuntary dismissal of plaintiff's wrongful death claim.

Similarly, we reject defendant's argument that a new trial on damages is necessary because allegedly the verdict could only have been based on "pure speculation coupled with sympathy, passion and prejudice." "A jury verdict is entitled to considerable deference[.]" Risko, 206 N.J. at 521. "A trial court should not disturb the amount of a verdict unless it constitutes a manifest injustice that shocks the judicial conscience." Carey, 132 N.J. at 66. "The appellate role is even more restricted . . . . [and] an appellate court should show appropriate deference to the trial court's 'feel of the case.'" Ibid. (quoting Baxter v. Fairmont Food Co., 74 N.J. 588, 600 (1977)).

Defendant contends that the present case is analogous to Brown, where the trial court ordered a new trial on damages and found that the jury's $825,000 wrongful death damages award was a "runaway verdict," that could only have

been the product of "sympathy, prejudice and passion." 312 N.J. Super. at 592. Defendant argues that as in the instant case, the plaintiff in Brown offered testimony that the decedent, his forty-nine-year-old daughter, had offered him companionship services in addition to housekeeping and clerical services, but provided no expert testimony or other specific testimony allowing the jury to quantify the monetary value of such services. See id. at 584, 595.

We find, however, that Brown is distinguishable from the instant case. In Brown, the plaintiff also testified that he had been paying for the decedent's living expenses prior to her death, leaving the jury "futilely without guidance" regarding the ultimate pecuniary value of the services the decedent had been providing or the "counterbalancing value of the decedent's living expenses." Id. at 594. Moreover, the plaintiff in Brown was eighty-six years old, leading the court to note that the estimable length of time in which the decedent could have been providing plaintiff with companionship or other services "could not have been long." Ibid. Accordingly, the panel upheld the order setting aside the $825,000 damages verdict, finding it had to have been based on conjecture. Id. at 595.

By contrast, in the instant case, plaintiff was not supporting Patrick and had a significantly longer life expectancy than the plaintiff in Brown. Moreover,

based on testimony of plaintiff, Irene, and Brandon, the jury could reasonably have found the free services Patrick was providing to his mother were equivalent to services provided by a therapist or counselor. See Green, 85 N.J. at 14. Similarly, the jury could have inferred from the closeness of the familial bond that, as plaintiff aged, Patrick was likely to provide services equivalent to that provided by a nursing home or caretaker. See id. at 19-20.

Consistent with longstanding precedent, we hold that plaintiff was not required to present expert testimony to establish the pecuniary value of such services. See Lesniak, 117 N.J. at 32-33; Green, 85 N.J. at 15-17; Brown, 312 N.J. Super. at 593-94. The jury was entitled to determine the value of such services from lay testimony using its "common knowledge and common experience[.]" Lesniak, 117 N.J. at 33.

Additionally, we note that defendant has provided no evidence that the verdict was animated by sympathy, passion, or prejudice. Indeed, the trial court twice issued the model jury charge on wrongful death damages, which directed the jurors not to consider plaintiff's "emotional distress" or "emotional loss" in their deliberations. See State v. Smith, 212 N.J. 365, 409 (2012) ("We presume the jury followed the court's instructions.").

For these reasons, we conclude that the trial court properly found that the jury's award of $500,000 in gross wrongful death damages does not shock the judicial conscience.[4] See Goss v. Am. Cyanamid, Co., 278 N.J. Super. 227, 244-45 (App. Div. 1994) (upholding $436,000 wrongful death verdict where the decedent had cared for his wife, the plaintiff, after two surgeries, had prepared meals for her, and had offered her "companionship, guidance, advice and counsel, all of which had significant pecuniary value"). Giving plaintiff all favorable inferences from the testimony presented at trial, we find there is ample evidence in the record to support the jury's award. We therefore affirm the final judgment and the trial court's order denying defendant's motion for a new trial on damages.

## C.

In summary, we find no reason to disturb the jury's verdict on liability or damages. To the extent we have not specifically addressed any remaining arguments raised by defendant, we find they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

---

[4] In upholding this sum, we reiterate that the extent of wrongful death damages is fact-sensitive and dependent on the distinct circumstances of each case. See Beim, 216 N.J. at 501-04.

A-1049-16T1

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-1049-16T1